[Civ. No. 11707.   Third Dist.   Sept. 4, 1968.]

In re KEVIN MICHAEL NEAL, a Minor. ALFRED TAUB-MAN et al., Petitioners and Appellants, v. RONALD BRUCE NEAL, Objector and Respondent.

Gualco, Hummel & Gualco and Elizabeth Inglis Hummel for Petitioners and Appellants.

Colley & McGhee and Nathaniel F. Colley for Objector and Respondent.

JANES, J. pro tem.*—This is an appeal by Alfred Taubman and Carol Taubman, his wife, from an order denying their petition under section 232 of the Civil Code to have Kevin Michael Neal declared free from the custody and control of his father, Ronald Bruce Neal.

Civil Code, section 232, in its pertinent part, reads as follows:

"An action may be brought for the purpose of having any person under the age of 21 years declared free from the custody and control of either or both of his parents when such person comes within any of the following descriptions:

"(a) Who has been left by both of his parents or his sole parent in the care and custody of another without any provision for his support, or without communication from such parent or parents, for the period of six months with the intent on the part of such parent or parents to abandon such person. Such failure to provide, or such failure to communicate for the period of six months, shall be presumptive evidence of the intent to abandon. Such person shall be deemed and called a person abandoned by the parent or parents abandoning him. If in the opinion of the court the evidence indicates that such parent or parents have made only token efforts to support or communicate with the child, the court may declare the child abandoned by such parent or parents."

The trial court found, inferentially, that the child's father, Ronald, had failed to communicate with the child during the statutory period, but found expressly that Ronald had not failed to support Kevin as alleged by petitioners.

---

*Assigned by the Chairman of the Judicial Council.

## Background of the Proceeding

Kevin was born on August 31, 1960, and was left in the care and custody of petitioners on August 1, 1964, by his natural mother, Betty, who is the sister of Mrs. Taubman. The boy has remained in the custody of petitioners since that date. The parents of Kevin had separated on May 15, 1964, and on January 19, 1965, they were granted an absolute decree of divorce in the Circuit Court of the State of Oregon; by that decree the custody of Kevin and four other children of the marriage was awarded to Betty, subject to reasonable visitation by their father, Ronald. The decree further ordered that Ronald pay, through the clerk of the court, the sum of $25 per month per child, or a total of $125 monthly, for support of the five children.

On February 7, 1966, a prior abandonment proceeding brought by petitioners was heard by the trial court and the petition was denied.

In May or June of 1966, the mother of the children then being a resident of Washington, Ronald petitioned the superior court in that state seeking modification of the Oregon decree and a transfer of custody of the five children from their mother, Betty, to himself. The petition was heard on October 28, 1966. The Washington court declined to act as to Kevin for the obvious jurisdictional reason but found the mother of the children unfit and removed from her custody the four children resident in Washington. The court further found that Ronald had neglected all five children, from both support and visitation standpoints, and awarded temporary custody of the four resident children to the juvenile department of the court pending demonstration by their father of his ability properly to care for them.

On July 14, 1966, the Taubmans filed a petition in Sacramento County seeking their appointment as guardians of Kevin. Ronald received notice of the hearing at his home in Oregon and delivered the citation to his Washington attorney. The Washington attorney forwarded the guardianship papers to California counsel representing Ronald in the present proceeding but the latter was unable to establish contact with Ronald; mail addressed to him at his regular Oregon address was returned by the post office department, marked, "Return to Sender—Unclaimed." In normal course the guardianship petition came on for hearing on September 21, 1966; Ronald did not appear in person or by counsel and the petition was granted.

On the date of their appointment as guardians of Kevin the Taubmans filed the present abandonment proceeding, more than six months having elapsed since the order of February 7, 1966, denying the prior petition.

## FAILURE TO COMMUNICATE

Upon hearing of the petition now before the court, the trial court denied the petition upon findings that "it is not true that the father of said child, the said RONALD B. NEAL, has failed to provide any support for said child *or to communicate with him* during the period alleged." (Italics added.) Thereafter, responsive to a motion by petitioners, the court made and filed a corrective order denying the petition but omitting the emphasized words, thereby finding only that the father had not failed to provide any support for the child during the period in question. No other findings were made.

Construing the findings of the court liberally, as we must (*Johndrow* v. *Thomas,* 31 Cal.2d 202, 207 [187 P.2d 681]), the reasonable construction and meaning of the court's final action is an implied finding that there was a failure to communicate with but no failure by the father to support the child as alleged. This construction finds support in the oral proceedings on the motion to correct the original finding. In discussing the matter with counsel the court stated: "Well, the record may reflect that I will strike 'or communicate with him,' but there isn't any question that the record will support the finding that the money was paid to the District Attorney up there for support of his children." Thereafter the court signed and filed the formal corrected order of May 31, 1967.

The finding of failure to communicate is not attacked. In view of the informality of that finding, however, we address ourselves briefly to the evidence which lends substantial support to the finding that Ronald failed to communicate with his son Kevin during the critical period. Although not hindered or prevented in any way from doing so, Ronald made no effort to visit with the boy on February 7, 1966, either at the time of hearing or after adjournment, nor did he attempt to contact the Taubmans or Kevin before returning to Oregon; the Taubmans lived in Los Angeles when the boy was delivered to them in 1964, but they have lived at their present Sacramento County address since June 1965; their Sacramento County address was furnished to Ronald at the February hearing, and the evidence as a whole strongly supports,

and in fact compels, an inference that he knew or could have learned of their address even prior to that date by the expenditure of very little time and effort; nevertheless, during the six months following the February hearing Ronald made no contact whatever with Kevin or with the Taubmans, by personal visit, mail or telephone.

This evidence amply and substantially supports the implied finding of the trial court that Ronald failed, for a period in excess of six months, to communicate with Kevin.

### FAILURE TO SUPPORT

■ Admittedly petitioners received no money whatever from Ronald for the support of Kevin from the date of the previous denial on February 7, 1966, to September 21, 1966, the date the instant petition was filed, and they were not aware of any support payments being made elsewhere for Kevin's benefit.

Ronald's contention that he did furnish support for the boy rests upon certain payments made by him through the office of the prosecuting attorney of Benton County, Washington. The mother of the children having moved from Oregon to the State of Washington, Ronald arranged to make his child support payments through the Benton County office, and, as disclosed by the record of the oral proceedings herein, the trial court's finding that there was no failure of support is based solely upon the fact and record of those payments.

Although Ronald testified that to the best of his recollection he had paid about $700 in child support for the five children, he produced no checks or other evidence to substantiate such a payment record, and the evidence from the office of the Benton County prosecutor reflects the following payments for the period February 7, 1966, to September 21, 1966:

| | |
|---|---|
| February 17, 1966 | $20 |
| February 23, 1966 | 20 |
| March 9, 1966 | 20 |
| April 18, 1966 | 20 |
| May 24, 1966 | 20 |
| July 20, 1966 | 20 |
| August 19, 1966 | 20 |

The testimony of Ronald is that he intended the foregoing payments to be for all five of the children. The total of the above payments, the sum of $140, if divided among the five children for the period in question, produces about $3.50 per month per child.

Accepting for the moment the proposition that the listed

payments were intended for all five of the children, it remains extremely doubtful on the record before us whether the payment of $3.50 per month constitutes evidence of more than token support of Kevin under section 232 of the Civil Code. There are two reasons, however, why it is unnecessary to belabor the point. First, there is no indication by finding or in the oral proceedings that the trial court considered the issue of token support; its finding of support is based simply and directly upon the fact that Ronald made the listed payments to the Washington prosecutor and that in so doing he evidenced an intent not to abandon his child. Secondly, the finding of support is itself unsupported by substantial evidence.

Ronald's assertion that his payments were intended for all five of the children is self-defeating. At no time did he specifically designate any of the money for or request that a separate account be set up for Kevin, nor did he ask that the funds be prorated among the five children. The prosecuting attorney forwarded all of the funds to Betty, and his testimony is that neither Betty nor Ronald requested him to disburse any portion for Kevin; he had no authority, in fact, under Washington law, to prorate any portion of such funds for children not resident in the State of Washington.

Further, as shown by the record in the first abandonment proceeding, Ronald knew, as early as January 1966, that no funds were reaching the Taubmans for the support of Kevin. This admission appears in a letter which he addressed to the probation officer on January 24, 1966, as contained in the probation officer's report filed with the court in the prior abandonment proceeding.[1] The file of the earlier proceeding is before us as petitioners' Exhibit 1, although the record discloses some confusion upon the part of the court and counsel as to its status.[2] The letter of January 24, 1966, is clearly relevant, in any event, however, and is independently admissible; it is of particular importance in relation to Ronald's protestations that his support payments were intended for Kevin as well as the other children. The admission bears

---

[1]Section 233 of the Civil Code provides for an investigation and written report by the probation officer upon the filing of a petition under section 232 and requires that the court ''shall receive such report in evidence and shall read and consider the contents thereof in rendering its judgment.''

[2]At the outset of the hearing upon the instant petition, petitioners offered both the file of the prior abandonment proceeding and that of the guardianship proceeding. They were received into evidence without objection as petitioners' Exhibits 1 and 2, respectively. At a later point in the hearing petitioners sought to have admitted into evidence (on an issue

directly upon his testimony as to the intent with which his payments were forwarded and as to his knowledge or lack of knowledge of the manner in which they were being applied.

Once alerted by the prior hearing of the hazards attending a failure to support, it was incumbent upon Ronald to take a meaningful course of action in order to avoid placing himself again in jeopardy of losing his parental rights over Kevin. With knowledge—although professing none—of the ineffectiveness of his efforts at support during the critical period of the earlier proceeding, he took no steps whatever from February 7, 1966, to September 21, 1966, to insure that his son would receive any part of the modest payments which were being made. Failing this, the proposition that there was no failure of support rests only upon the tenuous thread of his claimed intent, self-destroyed, and which we hold insufficient to support the finding that there was no failure of support.

### INTENT TO ABANDON

Absent communication or support for the period of six months, within the meaning of section 232, the presumption arises that Ronald intended to abandon his son. This presumption may be overcome by opposing evidence, however, and the question whether such intent to abandon exists and whether it has existed for the statutory period is a question of fact for the trial court, to be determined upon all the facts and circumstances of the case. (*In re Barton,* 168 Cal.App.2d 584, 588-589 [336 P.2d 210].) The evidence in the present record does not impel nor do we feel justified in dictating a finding that opposing evidence has or has not overcome the presumption which we have found to exist in that record. The trial court in a new or further hearing will be required to pass upon the weight to be given such evidence and the credibility of the witnesses (*In re Ayers,* 116 Cal.App.2d 55, 58 [253 P.2d 65]), particularly in connection with the Washington proceeding for change of custody, abortive as to Kevin, but relevant, nevertheless, upon the issue of intent and Ronald's testimony that he at no time intended to abandon his son.

---

not here in question) a letter written by Ronald and also contained in the file of the prior abandonment proceeding, already in evidence. Counsel for Ronald objected upon the ground that the letter was immaterial as part of a matter which had already been adjudged. The court erroneously sustained the objection but went on to point out, correctly, that it could not readjudicate the issues of the earlier proceedings.

## APPLICATON OF SECTION 232.5 OF THE CIVIL CODE

In a new hearing of the petition the court will be concerned with application of section 232.5 of the Civil Code, which appears not to have been considered at trial, although the subject is raised by petitioners on appeal. That section provides: "The provisions of this chapter [ch. 4, §§ 232-239, governing proceedings to declare a minor free from parental custody and control] shall be liberally construed to serve and protect the interests and welfare of the child."

Prior to the adoption of section 232.5 the rule was clear that the interests and welfare of the child were not issues in the determination of abandonment under section 701 of the Welfare and Institutions Code (the predecessor section of Civ. Code, § 232). A typical exposition of the rule is found in *In re Bisenius,* 173 Cal.App.2d 518, at pages 521-522 [343 P.2d 319]:

"There is considerable evidence it is true from which the trial court would have been justified in finding that the best interests and welfare of [the child] would be served by her remaining within the custody and control of appellant herein. . . . But we agree with the trial court's statement that:

" 'The future welfare of the child, however, and the best interests of the child are not issues in this proceeding. The Court is called upon to determine whether or not the natural mother abandoned the child within the meaning of Section 701, Welfare and Institutions Code.'

"    .    .    .    .    .    .    .    .    .    .    .    .    .

" [T]he question is one of determining whether or not the child has been abandoned within the meaning of said section 701, and is not one of making a wise selection between the petitioner and the children's mother."

Section 232.5 was added by the Legislature in 1965, and although no reported case construing the new statute has been brought to our attention or disclosed by our independent research, it is clear from the legislative study preceding its adoption that the Legislature had become concerned with the rigidity of existing custody rules preferential to the natural parents over third parties. (See 23 Assembly Interim Com. Report No. 6, (1963-1965) pp. 151-162, Child Custody Determinations, Final Report of the Assembly Interim Committee on Judiciary, Relating to Domestic Affairs.) Such law, the study found (p. 155), "stresses a proprietary or property interest in children, and does not in every case conform to or assure the best interests of the children."

Although the legislative study concerned itself with the broad field of domestic relations, including proposed family courts, and was addressed principally, in custody matters, to decisions which are normally temporary in nature, it is clear from an analysis of the study and the wording of the new statute that the Legislature intended a change in the existing law governing abandonment proceedings. In applying the provisions of section 232, therefore, the trial court must now consider, in a liberal application of those provisions, the best interest and welfare of the child before reaching its conclusion upon the issue of abandonment.

The order is reversed.

Pierce, P. J., and Friedman, J., concurred.