[Civ. No. 26295. First Dist., Div. One. June 24, 1970.]

In re VIRGINIA MORROW, a Minor.
ROBERT YOUNG et al., Petitioners and Respondents, v.
PATRICIA WALTERS, Objector and Appellant.

Counsel

Twohig, Haas & Schnal and Cyril Viadro for Objector and Appellant.

William R. Kennedy for Petitioners and Respondents.

Opinion

SIMS, J.—Patricia Walters the natural mother of a minor has appealed from an order granting the petitioners Youngs' petition to declare the minor free from parental custody and control. She contends that the evidence is insufficient to establish either of the grounds prescribed in subdivisions (a) and (b) of Civil Code section 232[1] for the making of such an order. The petitioners assert that the appeal should be dismissed for lack of jurisdiction because it was not filed within the period prescribed by law, and they also resist the objecting mother's argument on the merits.

█ Preliminarily it is determined that the petitioners, by their participation without objection in the mother's questionable, but, in any event, unsuccessful proceedings to obtain a new trial, are estopped to object to the timeliness of the filing of the notice of appeal. On the merits, however, the evidence is found sufficient to sustain the findings and order of the court. The order must be affirmed.

*Timeliness of the Appeal*

The petitioners contend that the appeal should be dismissed for lack of jurisdiction because the objecting mother failed to file a timely notice of

---

[1]Civil Code section 232 provides in part as follows: "An action may be brought for the purpose of having any person under the age of 21 years declared free from the custody and control of either or both of his parents when such person comes within any of the following descriptions: (a) Who has been left by both of his parents or his sole parent in the care and custody of another without any provision for his support, or without communication from such parent or parents, for the period of six months with the intent on the part of such parent or parents to abandon such person. Such failure to provide, or such failure to communicate for the period of six months, shall be presumptive evidence of the intent to abandon. Such person shall be deemed and called a person abandoned by the parent or parents abandoning him. If in the opinion of the court the evidence indicates that such parent or parents have made only token efforts to support or communicate with the child, the court may declare the child abandoned by such parent or parents. . . . (b) Who has been cruelly treated or neglected by either or both of his parents, if such person has been a dependent child of the juvenile court, and such parent or parents deprived of his custody for the period of one year prior to the filing of a petition praying that he be declared free from the custody and control of such cruel or neglectful parent or parents."

appeal. The record reflects that the court announced its decision in favor of the petitioners at the conclusion of the hearing on June 13, 1968, and directed the preparation of a decree. The formal order declaring the minor free from parental custody and control was signed, filed and entered on June 17, 1968, and was endorsed "Notice of Entry of Order mailed June 18, 1968."

Apparently in ignorance of the provisions of section 238 of the Civil Code, which indicate that court may have no power to grant a new trial,[2] the objecting mother on June 27, 1968 filed her notice of intention to move for a new trial. The matter was regularly set for hearing and heard on July 31, 1968. No objection was interposed to the motion. It was argued on the merits and was denied. A notice of appeal was filed on August 28, 1968, more than 60 days after the date of mailing notice of entry of judgment (see Cal. Rules of Court, rule 2(a)), but within 30 days after the entry of the order denying the objector's ostensible motion for a new trial (id., rule 3(a)).

The petitioners assert that where there is no provision for a new trial, a notice of intention to move for a new trial cannot be effective for any purpose. (See, *Estate of Welch* (1956) 146 Cal.App.2d 534, 538 [304 P.2d 57]; *Bryant* v. *Los Angeles Transit Lines* (1953) 116 Cal.App.2d 473, 474 [253 P.2d 731]; *Lynch* v. *Watson* (1945) 69 Cal.App.2d 51, 53 [158 P.2d 250];[3] and 3 Witkin, Cal. Procedure (1954) Appeal, § 121, p. 2297.) If the proceedings to secure a new trial were completely abortive, the time within which to file a notice of appeal expired on Monday, August 19, 1968 (the 17th falling on a Saturday). In that event this court would be without jurisdiction to consider the case on its merits, and should dismiss the appeal. (*County of Los Angeles* v. *Jamison* (1961) 189 Cal.App.2d 267, 269 [11 Cal.Rptr. 309]; *Estate of Welch, supra,* 146 Cal.App.2d 534, 538; *Bryant* v. *Los Angeles Transit Lines, supra,* 116 Cal.App.2d 473, 474.)

Petitioners not only failed to object to the proceedings in the trial court, but also failed to make a motion to dismiss the appeal before this court. They

[2]Civil Code section 238 provides: "Any order and judgment of the court declaring a minor person free from the custody and control of any parent or parents under the provisions of this chapter shall be conclusive and binding upon such minor person, upon such parent or parents and upon all other persons who have been served with citation by publication or otherwise as provided in this chapter. After making such order and judgment, the court shall have no power to set aside, change, or modify it, but nothing in this section shall be construed to limit the right to appeal from such order and judgment." (Cf. *In re Neal* (1968) 265 Cal.App.2d 482 at p. 485 [71 Cal.Rptr. 300].)

[3]The further holding in *Lynch* v. *Watson* that a motion for a new trial is not available after a dismissal of the case without a trial of the issues (69 Cal.App.2d at p. 53) was disapproved in, *Carney* v. *Simmonds* (1957) 49 Cal.2d 84, 90-91 [315 P.2d 305].

first raised the point of lack of jurisdiction in their reply brief filed May 1, 1969.

In *Slawinski* v. *Mocettini* (1965) 63 Cal.2d 70 [45 Cal.Rptr. 15, 403 P.2d 143], the court stated, "It is a well established policy that, since the right of appeal is remedial in character, our law favors hearings on the merits when such can be accomplished without doing violence to applicable rules. Accordingly in doubtful cases the right of appeal should be granted. [Citations.]" (63 Cal.2d at p. 72.) In *Slawinski* the plaintiffs were held to be entitled to rely upon the date set forth in the written order of the judge and the notice prepared and sent by defense counsel as correctly setting forth the date on which their motion for new trial had been denied and from which their time to appeal would run (*id.*). The case is generally viewed as recognizing that late filing of a notice of appeal may be relieved by proof of estoppel. (See *Mills* v. *Superior Court* (1969) 2 Cal.App.3d 214, 219 [82 Cal.Rptr. 469]; *Desherow* v. *Rhodes* (1969) 1 Cal.App.3d 733, 742-745 [82 Cal.Rptr. 138]; *Gomes* v. *Superior Court* (1969) 272 Cal.App.2d 702, 704 [77 Cal.Rptr. 539]; and Witkin, Cal. Procedure (1967 supp.) Appeal, §124B, pp. 965-966.)

Civil Code section 238 provides, ". . . the court shall have no power to set aside, change, or modify . . . [the order and judgment], but nothing in this section shall be construed to limit the right to appeal from such order and judgment." Code of Civil Procedure section 655 provides, "The provisions of this article apply only to superior courts and municipal courts." Section 656 gives the following definition: "A new trial is a *re-examination* of an issue of fact in the same court after a trial and decision by a jury, court, or referee." (Italics added.) Section 657 reads in part, "The verdict may be vacated and *any other decision may be modified or vacated*, in whole or in part, and a new or further trial granted on all or part of the issues, on the application of the party aggrieved, for any of the following causes, materially affecting the substantial rights of such party: . . ." (Italics added.) It is arguable that Civil Code section 238 refers to setting aside, changing or modifying an ordered judgment which has become final; that it is not intended to prohibit the re-examination which may generally be conducted under section 657 or section 663 of the Code of Civil Procedure before a judgment or order is final; and that the provisions of section 238 were merely inserted out of an abundance of caution to distinguish the continuing jurisdiction over custody which generally marks proceedings for dissolution of marriage. (Civ. Code, § 4600; and see former § 138.)[4]

---

[4]It is noted that despite the existence of similar provisions in former section 786 of the Welfare and Institutions Code (Stats. 1937, ch. 369, § 786, p. 1043) the trial court in *In re Cardenas* (1961) 194 Cal.App.2d 849 [15 Cal.Rptr. 238] entertained a parent's motion to vacate under Code of Civil Procedure section 473a over objection

It is unnecessary to resolve the foregoing question. For the purposes of this case, and pursuant to the policy enunciated in *Slawinski* v. *Mocettini, supra,* it is sufficient to determine that the petitioners, having failed to raise the point before, are now estopped to urge a construction of Civil Code section 238 which would preclude this appeal.

### Sufficiency of the Evidence

The order (judgment) from which the appeal is taken recites: "that said minor child has been left in the care of petitioners by her . . . natural parents and said parents have failed to communite with said child for a period of more than six months prior to the filing of said petition . . . with the intent on the part of her parents to abandon said minor child." (See § 232, subd. (a), fn. 1 above.) The court further found "that said minor child has been cruelly treated and neglected by her parents and that she has been a dependent of the Juvenile Court of the County of Monterey for a period of one year prior to the filing of said petition." (See § 232, subd. (b), fn. 1 above.)[5]

■■■ In attacking the sufficiency of the evidence to sustain the foregoing findings and the judgment predicated on them, the objecting mother is faced with the following rules on review:

"A reviewing court must accept as true all evidence tending to establish the correctness of the findings of the trial judge. All conflicts in the evidence must be resolved in favor of the respondents and all legitimate and reasonable inferences must be indulged in to uphold the judgment. It is well settled that whenever a finding or judgment of the trial court is attacked as being unsupported, the power of the reviewing court begins and ends with the determination of whether there is any substantial evidence, contradicted or uncontradicted which will support the conclusions reached by the trial court. [Citation.] All evidence most favorable to respondents must be accepted as true and that which is unfavorable discarded as not having sufficient verity to be accepted by the trier of fact. If the evidence so viewed is sufficient as a matter of law, the judgment must be affirmed [citation].

■ "That abandonment and intent under section 701, subdivision (a)

---

"that, under sections 785 and 786 of the Welfare and Institutions Code, the court had no power to modify or set aside the order." Thereafter, the trial court "with apparent consent of both counsel, treated the petition as a motion for a new trial in order that appellant might have a proper appeal." (194 Cal.App.2d at pp. 852-854.) The appeal was considered on the merits without mention of the procedural point.

[5]The father, having signed a written consent to adoption, has effectively relinquished his right to custody of the child. His rights are not at issue in these proceedings, although other evidence supports abandonment by him.

of the Welfare and Institutions Code [now, § 232, subd. (a) of the Civ. Code] are questions of fact for the trial judge is well established. His decision, when supported by substantial evidence, is binding upon the reviewing court. ■ An appellate court is not empowered to disturb a decree adjudging that a minor is an abandoned child if the evidence is legally sufficient to support the finding of fact as to the abandonment [citation]. This is true, also, on the question of intent." (*In re Gano* (1958) 160 Cal.App.2d 700, 705 [325 P.2d 485]. See also *In re Neal* (1968) 265 Cal. App.2d 482, 488 [71 Cal.Rptr. 300]; *In re Conrich* (1963) 221 Cal.App.2d 662, 668 [34 Cal.Rptr. 658]; *In re Bisenius* (1959) 173 Cal.App.2d 518, 524 [343 P.2d 319]; *In re Barton* (1959) 168 Cal.App.2d 584, 588-589 [336 P.2d 210]; and *In re Maxwell* (1953) 117 Cal.App.2d 156, 166 [225 P.2d 87].)

The record includes the written report of the juvenile probation officer and an addedum thereto prepared as required by the provisions of section 233 of the Civil Code,[6] and the reporter's transcript of the testimony elicited from the petitioners, a deputy probation officer, the county supervisor of child welfare, a welfare case worker, the minor's natural mother, her maternal grandmother, and the mother's present husband.[7] From this record the facts appear as set forth below.

The minor, Virginia, was born October 21, 1958. She was the second of three children born to her mother and sired by Victor Morrow. The natural mother had previously married Adolf Talerico in 1952 and as a result of this marriage had three boys born respectively May 21, 1953,

---

[6]Civil Code section 233 provides in part: ". . . Upon the filing of such petition, the clerk of the court shall immediately notify the juvenile probation officer who shall immediately investigate the circumstances of said minor person and the circumstances which are alleged to bring said minor person within any of the provisions of Section 232. The juvenile probation officer shall render to the court a written report of his investigation with a recommendation to the court of the proper disposition to be made in the action in the best interests of said minor person. The court shall receive such report in evidence and shall read and consider the contents thereof in rendering its judgment."

[7]The clerk's transcript also contains a petition for adoption which was filed simultaneously with the instant petition by the petitioners, the consent of the natural father, Victor Leroy Morrow, to the adoption, and a report of the State Department of Social Welfare recommending that the adoption be granted if the court determines that the minor is legally free from parental custody and control. There is nothing in the reporter's transcript to indicate that these matters, other than the consent of the father, were considered by the court. The record does indicate, however, that the court took judicial notice of the juvenile court proceedings in which the minor was made a dependent child of the court on October 8, 1964. These records have not been included in the record on appeal. Reference is also made to three declarations filed on behalf of the objecting natural mother. These declarations are not a part of the record, and it is not clear whether they were in fact considered by the court over the petitioners' objection.

May 1, 1954 and February 19, 1956. She separated from Talerico in 1955 or 1956 and commenced living with Morrow, whom she married November 13, 1959 after securing a divorce from Talerico January 19, 1959. As a result of her union with Morrow she conceived two other children, a son, Leroy, born April 18, 1957, and a second daughter, Michele born March 30, 1960.

In 1963, Michele was found to be operating in a 6 to 10-month level although she was then three years old. She was removed from the home and made a dependent child of the juvenile court on September 20, 1963. In May 1964 the mother sought psychiatric help from the Monterey County Psychiatric Clinic and commenced counseling which continued up to the time of the hearing in this action. Nevertheless, on September 21, 1964, a year after the first child had been removed from the home, Virginia and her brother were removed from the home. Virginia was placed with the petitioners where she has remained ever since, and her brother was placed in the same foster home as his younger sister. On October 8, 1964, Virginia and her brother were each adjudged to be a dependent child of the juvenile court under the provisions of subdivision (b) of section 600 of the Welfare and Institutions Code.[8]

The children had been removed on the recommendation of a physician because of neglect and "severe parental deprivation." The record is replete with evidence of Virginia's mental and physical retardation. It suffices to state that although she was almost six years old she was but 29 inches tall and weighed only 25 pounds, could not talk, only mimic, and was not toilet trained. At the time the mother stated that she could not cope with the children, that she was resentful of them, and that she was agreeable to having them placed out of her care. At the hearing in 1968, the mother acknowledged that in 1964 because of her emotional illness she had feared her children, and that she could not handle them then, she could not affirm or deny whether she had stated that she had an emotional block toward the Morrow children, but believed she could have stated that she had felt that the Morrow children were not even her own.

In November 1964 the mother, accompanied by Mr. Morrow, paid her only visit to Virginia at the petitioners' home. There was no communication

---

[8]Welfare and Institutions Code section 600 provides in part: "Any person under the age of 21 years who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge such person to be a dependent child of the court: . . . (b) Who is destitute, or who is not provided with the necessities of life, or who is not provided with a home or suitable place of abode, or whose home is an unfit place for him by reason of neglect, cruelty, or depravity of either of his parents, or of his guardian or other person in whose custody or care he is."

between mother and child, and the father took the girl outside. On returning, Virginia ran in and hid in a closet and had to be persuaded that her parents were not taking her back before she would come out. That evening she vomited at the dinner table, and for a week she suffered a relapse in wetting her bed. The petitioners reported to the county welfare department, to which supervision of the case had been delegated, that the parents' visit had upset the child. Although the welfare supervisor indicated that visiting privileges had never been denied the mother or the father, the records acknowledgedly indicated that prior to October 1967 the county welfare department had not allowed the mother to visit the Morrow children because it upset them, and on November 27, 1967 it was noted that it would be necessary to explore the mother's interest in the Morrow children before any visits were allowed so as not to upset the children. The mother testified that the welfare department told her in 1965, and again in 1967, that it would not be advisable for her to see her children. The probation officer verified that the Morrows complained in late 1964 that the welfare department had asked them to curtail their visits to Virginia and they were referred back to that department. Nevertheless, there is nothing to show that the mother attempted to open up the subject of visitation with the welfare department between November 1964 and October 1967.

In January 1965, the three Talerico boys were removed from the mother's custody, and on January 21, 1965 an order was entered adjudging them dependent children of the juvenile court because of parental neglect.

On April 26, 1965, the mother came into the welfare department and signed a semi-annual application to establish the childrens' eligibility for aid to needy children. In September 1965 she attended the annual hearing in juvenile court (Welf. & Inst. Code, § 729) to review the status of the Morrow children. At that time she was quite withdrawn and stood aside, and there was absolutely no communication between her and her children.

In October 1965 the mother paid her last visit to her daughter prior to the filing of the petition in this action. Virginia was in a hospital where she had a fatty tumor removed from her back on October 13, 1965. The mother and the child's maternal grandmother visited her on that occasion. According to the petitioners, and as admitted by the mother, there was no further comunication between mother and daughter or between the mother and the petitioners either by way of visit, telephone call, letter, note, Christmas, birthday or other gift or card.

The Morrows separated in 1965 and in December 1965 the mother filed suit for divorce. She instructed her attorney that Morrow should have custody of his children. She testified that she did this because she had a guilt complex and wanted to be fair to him due to the fact that he had undergone

a vasectomy at her request at the time the children were taken away. The mother did not see her daughter at all during 1966. Her only communication with the juvenile or probation authorities was a house call by the welfare supervisor to discuss the 1966 annual review. The mother, however, did not attend the hearing.

On December 27, 1966, the mother was finally divorced from Morrow, and on the same day she married her present husband. On January 19, 1967 the dependency status of the Talerico children, with whom the mother and maternal grandmother had continually communicated at least once a month through 1965, 1966 and 1967 was reviewed and renewed. In June 1967, the three boys were released to the custody of their mother on a trial basis, and in January 1968 they were discharged as dependent children. At the time of the hearing in this action they apparently were getting along well in a home with their mother, stepfather and maternal grandmother.

In 1967 there was no communication between the mother and Virginia. The mother did not appear at the hearing on the annual review on September 14, 1967, and the child's dependency status was continued by order of the court.

Meanwhile, Mr. Morrow resumed visitations with Virginia about three months after the November 1964 incident. He visited six or seven times in all during 1965 and 1966. He brought her presents for her birthday, Christmas and Easter, and made his last visit on her birthday October 21, 1966. He telephoned to inquire after her condition when she was in the hospital in October 1965. He reportedly terminated his visits, and all other communications with the children, because the visits distressed him and because it was too confusing for the children. He apparently made intermittent payments for the support of his three children until October 26, 1967. He filed a formal consent to the adoption by petitioners on May 6, 1968.[9]

The mother testified that she knew the father was paying support and making regular visitations and that she thought his children would be assured a good home; that she believed he was visiting the children in 1967; that she only heard in September or October 1967 that he was no longer communicating with them and was consenting to Virginia's adoption; and that it was

---

[9]The report for the adoption proceedings (see fn. 6 above) recites, "The father claimed that with the understanding of the Probation Department he had not visited the minor for the past several years as he felt it was confusing to her. He believes that the petitioners have been the real parent figures to his daughter, he was anxious for her to relate positively to them and it confused her to have him appear for visits as her other father. He feels that the best interests of the minor will be served by the adoption and stated that the natural mother had frequently expressed her complete disregard for the minor and her siblings."

then that she asked the welfare department if she could resume visitations for herself.

The record reflects that the petitioners started thinking about adopting Virginia in 1967 because she fit in well with their family (father, mother, sons 11 and 8 and daughter 6), and because the girl would become upset whenever a foster child, temporarily in the home, would leave. It also appears that following the mother's request for visitations in October 1967, and while it was under study, the welfare department in December 1967, and a psychiatric social worker at the county clinic interceded on behalf of petitioners to secure the mother's views regarding consent for the adoption; and that the mother having indicated that she did not wish to give her consent, the present proceedings together with a petition for adoption were filed on January 24, 1968.

Thereafter, there were two visitations between the child and her mother and stepfather. In February or March, the three Morrow children were brought to the probation office. According to the welfare department supervisor who attended the confrontation along with a probation officer, there was almost a total lack of communication between the mother and the children. The stepfather did all the talking. On her return from this visit Virginia refused to talk about and never said a word about seeing her real mother.

Thereafter, and prior to the hearing on June 13, 1968, a social welfare worker took the three children to meet the mother and stepfather at a park. The mother greeted the children with a salutation, but it was the stepfather who hugged them, played tag with them, talked to them about their school, and opened the trunk of the car and handed them little gifts. On her return, Virginia related that she had received a gift from her stepfather, and that he had talked and played with her, and that her mother looked better, dressed much better than she used to, but was the same as she was before.

The mother explained that she was constrained because these were supervised visits, and that she had feelings for her children which were not revealed because she was not an emotional person and did not show her emotions very much.

The objecting mother insists that her mental and emotional condition throughout the period under review was such that the trial judge should have found neither the necessary intent to abandon, nor the necessary cruel treatment or neglect. Before examining this contention in the light of the foregoing evidence, it is necessary to analyze the requisites under the subdivisions of section 232 at issue in this case.

Under subdivision (a) it is required that the child ". . . has been left by

both of his parents or his sole parent in the care and custody of another. . . ." "The cases . . . establish the rule to be that when a child is taken from a parent by a judicial wardship proceeding, such child has not been abandoned under subdivision '(a)' of section 701." (*In re Maxwell, supra,* 117 Cal.App.2d 156, 162. See also cases reviewed *id.* at pp. 162-164; *In re Conrich, supra,* 221 Cal.App.2d 662, 666; *In re Barton, supra,* 168 Cal. App.2d 584, 587; and *In re Jones* (1955) 131 Cal.App.2d 831, 834-836 [281 P.2d 310].) ■ Under subdivision (a) no intent to abandon can be inferred or presumed from the mere fact that the mother (and the father) so conducted themselves that they were deprived of the custody of their children.

"The fact that a judicial decree has placed custody of the child away from the parents does not, however, necessarily prevent or destroy the element of 'leaving' because nonaction of the parents may convert into a leaving (and, the other elements present, into an abandonment) that which initially could not be regarded so. (*In re Maxwell,* 117 Cal.App.2d 156, 165 . . . [three year nonaction by parent after child was made ward of juvenile court; trial court's finding of abandonment upheld despite mother's rehabilitation from alcoholism]; *In re Barton,* 168 Cal.App.2d 584 . . . [trial court's finding of abandonment sustained for lack of communication or support, although child was placed by guardianship decree following mother's consent for guardianship for care; mother had tried to regain child by habeas corpus, and testified noncommunication was based on belief she was forbidden by court to communicate with child, and no demand had been made for support].) The relevant nonaction of the parents is that of failure to contribute to support or to communicate, subjects considered below, but the conclusion on his first point, that of 'leaving,' is that there may be such leaving even though originally a court decree had taken the custody of the child from the parents." (*In re Conrich, supra,* 221 Cal.App.2d at pp. 666-667.)

■ Under subdivision (a), therefore, the salient point is the mother's failure to communicate with her daughter from November 1964 until her request to see her in October 1967. A "failure to communicate for the period of six months, shall be presumptive evidence of the intent to abandon. . . . If in the opinion of the court the evidence indicates that such parent . . . [has] made only token efforts to . . . communicate with the child, the court may declare the child abandoned by such parent. . . ." (§ 232, subd. (a), portion.) Unless the presumption of abandonment raised by the foregoing admitted fact has been overcome as a matter of law, the findings and order of the trial court under subdivision (a) must be sustained. (*In re Neal, supra,* 265 Cal.App.2d 482, 488; *In re Cardenas* (1961) 194 Cal. App.2d 849, 854-855 [15 Cal.Rptr. 238]; *In re Barton, supra,* 168 Cal. App.2d 584, 590; *In re Gano, supra,* 160 Cal.App.2d 700, 706.)

■ The evidence as to the mother's emotional and mental condition does not show she was incapable of communicating with her daughter during the period in question. There is no showing that the mother was incompetent in the sense that she was unable, unassisted, properly to manage and take care of herself and her property. (Cf. Prob. Code, §§ 1460 and 1751.) The probation officer acknowledged that when she saw the mother in 1964, when Virginia was removed from the home, she appeared to be distraught, mentally ill, very withdrawn and "sometimes not present." The child welfare supervisor knew she had been mentally ill. The mother testified that her mental state was not good in 1964; that since the middle of 1964 she was seeing a psychiatrist or a psychiatric social worker at least once a week; that she thought that eventually she would be well enough to have the children in her home again. Her psychiatric history is confirmed by exhibits in the probation officer's report, the addendum thereto, and the report of the State Department of Social Welfare. On the other hand, she was never hospitalized because of any mental condition. She continuously visited with her three boys at least once a month during the period they were taken from her custody and while she considered herself emotionally ill and was seeing a psychiatrist. She secured a divorce from Morrow, accomplished a new successful marriage, and negotiated with the juvenile authorities for the return of her three boys. (Cf. *In re Maxwell, supra,* 117 Cal.App.2d 156 at pp. 165-166; but note *In re Jones, supra,* 131 Cal.App.2d 831, at p. 834.)

It may be conceded for the purposes of this case, as has been determined in connection with section 224 of the Civil Code,[10] that "before a failure to communicate with her children for a period of one year [six months by § 232, subd. (a)] may operate to deprive a mother of her right to object to the adoption of her children, it must be shown that during the interval in question she was able to communicate with them and failed to do so." (*Adoption of Smith* (1969) 270 Cal.App.2d 605, 608-609 [75 Cal.Rptr. 900].) It may be assumed that the evidence of the mother's emotional instability, of the instructions of the welfare department, and of the mother's changing views concerning relinquishing custody to the father of the children, would sustain a finding that the mother's failure to communicate should be excused. (See *Adoption of Smith, supra,* 270 Cal.App.2d 605, 609; *In re Bisenius, supra,* 173 Cal.App.2d 518, 522-523; *In re Williams*

---

[10]Civil Code section 224 provides in part: "A legitimate child cannot be adopted without the consent of its parents if living; however, after the custody of any child has, by any judicial decree, been given to the father, and the mother for a period of one year fails to communicate with such child when able to do so, or been given to the mother, and the father for a period of one year shall willfully fail to pay for the care, support and education of such child when able to do so, then the parent to whom custody has been given alone may consent to such adoption, . . . ."

(1955) 133 Cal.App.2d 515, 518 [284 P.2d 510]; and *In re Jones, supra,* 131 Cal.App.2d 831, 836.)

Nevertheless, the trial court was entitled to find as noted above, that her emotional instability did not prevent her from communicating with and manifesting an interest in others of her offspring. The instructions of the welfare department were not questioned for almost three years, although during that period the mother had opportunities to consult with the welfare department and juvenile probation department and interested herself in recovering the custody of her three boys. (Cf. *In re Barton, supra,* 168 Cal. App.2d 584, at p. 589.) The explanation that she was leaving the custody of the Morrow children to her husband and only sought them when she learned he was abandoning them may be suspect, because it shows in itself an ambivalent, as well, as a conditional, attitude toward the custody of those children. The court could find that her interest in Virginia was only rekindled by the feeling of guilt engendered by the threat of the adoption itself, and by the incitation of her new husband. The finding and judgment under subdivision (a) of section 232 are sustained by the record.

The facts established (see fn. 8, and accompanying text above) show that Virginia was cruelly treated and neglected by both of her parents; that she was made a dependent child of the juvenile court; and that her parents had been deprived of her custody from October 8, 1964 to the date of the hearing June 13, 1968. The foregoing fulfills the requirements of the provisions of subdivision (b) of section 232 on their face. (See fn. 1 above; and *In re Halamuda* (1948) 85 Cal.App.2d 219, 225-226 [192 P.2d 781].) Some precedents, however, indicate that inquiry into the issue of cruelty or neglect is not foreclosed by the order making the minor a dependent child of the juvenile court. *In re Williams, supra,* 133 Cal.App.2d 515, stated at page 518: "Appellants' argument that the court failed to take into account subdivision (b) of said section is without merit. The report of the probation officer indicates that the child was made a ward of the court on the filing of a petition under subdivision (b) of said section. However, there is substantial evidence to the effect that the mother was unable financially or otherwise to care for her child during part of the time involved and that her request to obtain possession of the child was denied by the welfare department."

*In re Zimmerman* (1962) 206 Cal.App.2d 835 [24 Cal.Rptr. 329] involved proceedings to have a minor declared free from the custody and control of her mother under provisions of law substantially similar to those now found in subdivision (c) of section 232.[11] Eighteen months prior to the

---

[11]Welfare and Institutions Code, former section 701, subdivision (c) read: "(c) Whose parent or parents are habitually intemperate, or morally depraved, if such

filing of the petition the juvenile court had made an order depriving the mother of custody of the minor and placing her with her paternal grandparents under the provisions of former subdivision (d) of section 700 of the Welfare and Institutions Code which read, "(d) Whose home is an unfit place for him, by reason of neglect, cruelty or depravity of either of his parents." (Cf. Welf. & Inst. Code, § 600, subd. (b), fn. 8 above.) The grandparents appealed from a denial of their petition and contended as follows: "(1) That in the instant proceeding based upon subdivision (c) of section 701, the court below was required to determine only (a) that the child had been a ward of the court and the parent deprived of her custody because of moral depravity for the period of one year continuously immediately prior to the filing of the petition, and (b) that the respondent parent had not been rehabilitated, the burden being upon the respondent to prove that she had become fully and permanently rehabilitated." (*Id.,* p. 842.)

This court, after reviewing the distinction between a proceeding to declare a minor a ward (now dependent child) of the juvenile court, and a proceeding to declare the minor free from the custody and control of his parents, concluded, "We do not think that such proceedings to free a child from parental control have been invested by the Legislature with the rigid and inflexible character that appellants ascribe to them. It is clear to us that the court's consideration of the matter must proceed beyond the point of concluding merely that the mother was deprived of the custody of her child for moral depravity and that the period of a year has elapsed. The court in the instant proceedings is not finalizing an antecedent interlocutory judgment." (*Id.,* p. 843.)

■ So here the parent was entitled to have the circumstances leading to the earlier order reviewed in the light of subsequent events, and with consideration of the nature of the order sought in the second proceedings. The 1964 order making Virginia a dependent child of the juvenile court, and the orders made in 1965, 1966 and 1967 continuing that status, are not subject to review in these proceedings, but the question of the nature of the cruelty or neglect upon which the original 1964 order was predicated may be the subject of inquiry. She relies on the following statement, made in a case reversing, for insufficiency of the evidence, an order which made children wards of the court, and transferred their custody from their father to their maternal grandmother. "We think it is only in instances where there is demonstrated incapacity or something akin to criminal neglect that the law

person has been a ward [now "dependent child" in Civ. Code, § 232, subd. (c)] of the juvenile court, and the parent or parents deprived of his custody because of such intemperance, or moral depravity, for the period of one year continuously immediately prior to the filing of the petition praying that he be declared free from the custody and control of such habitually intemperate or morally depraved parent or parents."

is justified in interfering with the natural relations of parent and child." (*In re Gutierrez* (1920) 47 Cal.App. 128, 130 [190 P. 200].)

The probation report filed in these proceedings, after referring to the proceedings under which the three Morrow children and three Talerico children were removed from the custody of the mother because of serious neglect, recites: "No Court action was taken against the mother as she was emotionally disturbed and later submitted to psychiatric counseling at the County Clinic." The conditions described in the reports filed in these proceedings sustain the court's finding "that said minor child has been cruelly [*sic*] treated and neglected by her parents." Since the order and judgment in these proceedings may be upheld under the provisions of subdivision (a) it is unnecessary to determine to what extent the parent must be criminally responsible for the original cruelty or neglect. (Cf. § 232, subd. (c) [parents habitually intemperate or morally depraved]; subd. (f) [parents declared mentally deficient or mentally ill]; and (g) [parents incapable of supporting or controlling child].)

The petitioners concede that in proceedings under subdivision (a) the court is to consider the present fitness of the parent. (See *In re Cardenas, supra,* 194 Cal.App.2d 849, 855.) *In re Zimmerman, supra,* indicates that under subdivision (c) the court should consider the present condition of the erring parent (206 Cal.App.2d at pp. 844-845). It is reasonable to consider under subdivision (b) whether the conditions which gave rise to the cruelty or neglect still persist.

 In this case the court had such evidence before it. On the one hand it appears that the mother had successfully rehabilitated herself. She testified that she thought she was well and could handle the Morrow children, and that she was getting along well with her three sons. The report from the probation office and an included report from the psychiatric clinic confirmed that with the help of her husband she was managing well with the Talerico children. This conclusion was also confirmed by the testimony of the social worker, and the testimony of her husband. On the other hand, it was brought out that the mother was still under psychiatric treatment; that she had been diagnosed as basically indifferent to the younger children; that it would be hazardous for her health to take the younger children into her home; that she would do well to provide an adequate home for the three older children; and that in a prehearing interview she stated that she did not feel she could be responsible for taking care of Virginia at that time. The court also had before it the accounts of the post-petition visits.

The trial court, in considering the mother's present fitness, was entitled to take into account the history of her demeanor over the preceding four years. The neglect may consist not only in the deprivation of material support, but

in the deprivation of the emotional stimulus and outward love and affection to which a child is enttitled from his mother. The substitution of an affectionate stepfather would not necessarily cure the emotional shortcomings of the mother. The evidence was sufficient to sustain an implied finding that the mother was not presently fit to furnish Virginia the motherhood to which she was entitled.

Finally it should be noted that since 1965 (Stats. 1965, ch. 1064, § 1, p. 2710) the courts have been under the following mandate: "The provisions of this chapter shall be liberally construed to serve and protect the interests and welfare of the child." (Civ. Code, § 232.5. See *In re Neal, supra,* 265 Cal.App.2d 482, 489-490. Cf., under prior law, *In re Zimmerman, supra,* 206 Cal.App.2d 835, 847; *In re Bisenius, supra,* 173 Cal.App.2d 518, 521; and Welf. & Inst. Code, former § 784 [quoted, *In re Zimmerman, supra,* 206 Cal.App.2d at p. 844], Stats. 1937, ch. 369, § 784, p. 1043, which was not carried forward into the Civ. Code by Stats. 1961, ch. 1616, § 4, pp. 3504-3507.) The probation officer stated, "From the standpoint of the child's welfare, though it is doubtful that her best interest would be served by removing her from a home where she now feels the first real security and warmth she has ever experienced. It is even questionable, whether or not she could weather any severe change in her present situation without a return to her formerly emotionally disturbed state." The probation report (Civ. Code, § 233) concludes, ". . . we believe it is in the best interest and welfare of Virginia that this petition be granted in order that the adoption can proceed." The evidence supports these conclusions.

As suggested by petitioners, the following is adopted: "We realize that the record shows that appellant has made a praiseworthy and apparently successful effort to rehabilitate herself. We have no doubt of her present sincere desire to care for Linda. It is a most serious responsibility to deprive a parent of her child. But the Legislature has provided that if the child is abandoned, as defined in the section, the trial court may enter such an order. The weight to be given to the rehabilitation of appellant and her excuses for her past conduct was for the trial court. It has found the facts required by law. Those findings are supported. Therefore, this court must affirm." (*In re Maxwell, supra,* 117 Cal.App.2d 156, 166.)

The purported appeal from the order denying the objector's motion for a new trial is dismissed. The order declaring the minor free from parental custody and control is affirmed.

Molinari, P. J., and Elkington, J., concurred.