[Civ. No. 39957. Second Dist., Div. Five. Apr. 18, 1973.]

In re JEANNIE Q. et al., Persons Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
LINDA Q., Defendant and Appellant.

**COUNSEL**

Frederick J. Kamminga, Peter E. Ronay, Kamminga, Ronay, Swanson & Siegel, Robert L. Walker and William G. Clements for Defendant and Appellant.

Terry J. Hatter, Jr., Abby Soven, Ernest L. Aubry, Philip L. Goar and Ralph Faust as Amici Curiae on behalf of Defendant and Appellant.

Joseph P. Busch, District Attorney, Harry Wood and Daniel L. Bershin, Deputy District Attorneys, for Plaintiff and Respondent.

## OPINION

**COLE, J.\*** — The principal questions presented by this appeal are (1) whether, prior to instituting proceedings pursuant to section 600 of the Welfare and Institutions Code[1] to have children declared to be dependents of the juvenile court, social welfare agencies must first provide the child protective services established by sections 16500-16511; and (2) whether, prior to declaring that dependent children of the court are to be removed from the custody of their parents the juvenile court must first provide such services. We have concluded in response to each question, that the public agency involved or the court, as the case may be, should consider whether child protective services are the appropriate solution for the particular problem presented, but that there is no mandatory duty to furnish such services before instituting court proceedings or before removing children from the custody of their parents.

This is an appeal by a mother from a judgment declaring five minors to be dependent children of the juvenile court (§ 600, subd. (a)) and ordering them committed to the care, custody and control of the Los Angeles County Department of Public Social Services (hereinafter DPSS).

Petitions were filed on May 5, 1971, as to the five children of Mrs. Q. (sometimes "the mother" or "appellant") alleging that they come within section 600, subdivisions (a) and (b).[2] After taking testimony and other evidence the court concluded that paragraph 1 of each of the petitions should be sustained, in that the children came within the provisions of section 600, subdivision (a). The court held that paragraph 2 of each petition alleging that the children came within section 600, subdivision (b) was inappropriate, and dismissed each of these paragraphs in the interests of justice. After a disposition hearing the court ordered that the children remain in the custody of the DPSS for eventual placement in foster homes.

---

\*Assigned by the Chairman of the Judicial Council.

[1]All statutory references are to this code unless otherwise indicated.

[2]At the time the petitions were filed section 600, subdivisions (a) and (b) provided as follows:

"Any person under the age of 21 years who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge such person to be a dependent child of the court:

"(a) Who is in need of proper and effective parental care or control and has no parent or guardian, or has no parent or guardian willing to exercise or capable of exercising such care or control, or has no parent or guardian actually exercising such care or control.

"(b) Who is destitute, or who is not provided with the necessities of life, or who is not provided with a home or suitable place of abode, or whose home is an unfit place for him by reason of neglect, cruelty, or depravity of either of his parents, or of his guardian or other person in whose custody or care he is . . . ."

*Facts*

Betty Wise, a protective services worker with DPSS, first had contact with the family on November 5, 1970. She responded to a telephone call from a Headstart school regarding Larry and found bruises on his face and some cuts on his head and hand. She took him home, where she had an opportunity to see all the children: Jeannie, age 5; Larry, age 4; Roy, age almost 2; and Carlos, age 9 months. Michelle had not yet been born.[3] Jeannie appeared to be all right. Mrs. Wise felt that Roy's legs were bowed, and noted a faint burn scar on his chest. She felt that Carlos was very small for his age.

The children were being aided under the Aid to Families with Dependent Children Program (hereafter AFDC).

Because of her concern for the children Mrs. Wise arranged, with the cooperation of appellant, to have them examined at Los Angeles County USC Medical Center ("LACUSCMC"). Between November 1970 and March 1971, Mrs. Wise had personal contacts with the family on at least 25 occasions, including a number of times in which she transported Mrs. Q. and the children to LACUSCMC. It was her impression that Larry was always in a state of healing on some part or other of his body. She noticed that he had black eyes on three occasions.

At the time of her original contact with Mrs. Q., Mrs. Wise asked whether the children had a regular doctor. Appellant indicated that when there was an illness she took the children to a clinic headed by Dr. Medoff.

In mid-February 1971, Mrs. Wise received the reports on the examinations of the children by Dr. Osgood at LACUSCMC. The examination doctor concluded that Jeannie suffered from a retardation in growth. Specifically, X-ray examination showed a bone development retardation of about two years. There was no evidence of any other physical problem. A Gesell test of developmental neurologic screening showed that Jeannie also was fairly extensively retarded in her mental and social development. Dr. Osgood was unable to find any explanation for Jeannie's condition except malnutrition—especially, not enough proteins and carbohydrates. The results for Larry were essentially the same: a significant retardation in growth and personal-social development, with no apparent explanation except malnutrition. Carlos' examination showed him to be within normal limits in all respects, though his weight was low. Roy was found to be "extremely healthy" by anyone's standards.

---

[3]The children were not all of the same father.

Dr. Osgood also found Jeannie to be very personable and relatable, which he felt was extremely unusual for a hungry child. Larry, too, was very vigorous, active, cooperative, and "flamboyant." He felt that this was an indication that Jeannie was receiving "Some kind of warmth," and while he had reservations about Larry's apparent relationship with his mother, the doctor felt that his behavior was very positive. He testified that a lay person might not spot Jeannie's and Larry's symptoms of malnutrition if the children did not complain, and that the mental retardation of a parent would contribute significantly to the low scores of Jeannie and Larry on the Gessell test if the children were dependent on that parent for most of their stimulation.

Mrs. Wise also testified that she never attempted to contact Dr. Medoff at the clinic to which the mother said she took the children; that Mrs. Q. was very cooperative with her in relation to the arrangements for the medical examinations; that Mrs. Q. had never been provided a "homemaker" by the DPSS; that Mrs. Wise had never attempted to explain to her the proper use of the food stamps she was receiving nor to provide any nutritional counselling; that the mother cooperated fully when Mrs. Wise wanted to have a volunteer come and provide recreation outside the home for the children; and that Mrs. Q. loved her children and did the best she could for them. Mrs. Wise testified that she did not suspect that the children were suffering from malnutrition until she received the doctor's reports shortly prior to starting the proceedings below. She also testified that Mrs. Q. was receiving aid to the totally disabled because of mental incapacity; specifically, the mother has a cumulative I.Q. of 61. We have taken judicial notice of the juvenile court file. The social worker's reports in that file indicate that Mrs. Q. cannot read, write or tell time and that she suffers from mental retardation.

There was evidence that Jeannie, Larry and Roy had been examined at the clinic by Dr. Medoff a substantial number of times in the two years before the filing of the petitions.

Appellant testified that she thought that her children were well fed, and that she didn't favor one child over another. She gave exculpatory testimony as to how the boys, especially Larry, received bruises and scratches, and how Larry received a burn which had been observed on his body. She said that she spanked her children on occasion, but never beat them. She said that Dr. Medoff had told her that the children were healthy. No one had ever told her that her children were not healthy, and if someone had told her they were very sick she would have taken them to the hospital.

Mrs. Q. further testified that she had never been to school, because she had had to care for her sick mother and her 10 brothers and sisters. She agreed with previous testimony to the effect that Larry and Roy tended to wolf their food down and hoard it. She said that she tried to stop them.

A neighbor testified to a number of incidents in which the mother had mistreated or threatened to mistreat her children, all of which were denied by Mrs. Q. A deputy sheriff testified to his observation of certain bruises and scars on Larry in June 1971, the day after he had been placed in a foster home.

At the disposition hearing the defense suggested the possibility that appellant's sister, Mrs. Ayala, live with Mrs. Q. and the children to help her provide a good home for the children. The court, as noted above, ordered the children to remain in the care, custody and control of the DPSS.[4] It then added the following comments:

"Now, I want to express for the mother's benefit the Court's view. That is that these children are very much in need of proper care. I do not feel that the mother has intentionally neglected these children in any way. I think she has done her best. However, I don't think it is the type of case where placing a home maker in for a short period of time to instruct the mother would meet the needs, and the offer to have Mrs. Ayala in the home does not seem to enhance the situation much more than having Mrs. [Q.] there. It is particularly important, considering the age of these children, that they get adequate nourishment and supervision, and opportunities for development.

". . . . . . . . . . . . . . . . . .

"I appreciate the mother loves her children. She has done the best she can. Society has not treated her very well throughout her lifetime. She has been deprived of things which most people have. I feel a great deal of sympathy for her in that society is now stepping in and saying that she can not have her children at this time. But, the obligation of the Court runs primarily to the welfare of the children. The philosophy behind the law in connection with dependent children is that the children should be returned to the parent when court supervision is no longer required by the needs of the children. This is one of the reasons the Legislature has required the Court to review the matter on an appearance basis at

---

[4]Custody had been voluntarily given to the DPSS before these proceedings pursuant to an agreement between the parties.

least once a year, to see whether or not continued court supervision is necessary.

"I think quite possibly as the children get a bit older and are more able to fend for themselves, that perhaps Mrs. [Q.], with proper advice, can function satisfactorily as a mother. I am convinced that she has done the best she could, that she is sincere, that she loves the children, but the Court, faced with the facts that we have, is under an obligation at this time to remove the custody from the mother.

"I realize, also, that the mother, Mrs. [Q.], is obviously not in sympathy with what the Court is doing, but I do wish Mrs. [Q.], that you realize that the social workers are there in their position as social worker to be of help to the children and to the parent. So, the fact that I am making the order that I am, should not, I hope, cause you to feel antagonism toward the social workers. These are the people with whom we are going to ask you to work for the benefit of your own children; visitation, perhaps the development of your home situation so that ultimately the children can be returned home to you.

"That is the order of the Court."

Appellant's contentions that she and her children were entitled to receive child protective services is grounded on the following reasoning: First, there is a strong public policy favoring the strengthening and support of family life. To promote this policy numerous federal and state statutes emphasize the importance of family life and that the removal of dependent children from their homes and their placement in the custody of others is to be a last resort. Second, under the mandate of federal statutes in connection with AFDC the state had to provide the services in question here before the juvenile court could proceed to remove the children from Mrs. Q.'s custody.

### The State's Interest in Maintaining the Family Unit

We need not dwell for long either on the obvious interest of the state in seeing that family units are kept together or the proposition that removing dependent children from the custody of their parents is to be done only when necessity demands that such removal occur. Thus section 502 provides "The purpose of [the Juvenile Court Law] is to secure for each minor under the jurisdiction of the juvenile court such care and guidance, preferably in his own home, as will serve the spiritual, emotional, mental, and physical welfare of the minor and the best interests of the State; to preserve and strengthen the minor's family ties whenever

possible, removing him from the custody of his parents only when his welfare or safety and protection of the public cannot be adequately safeguarded without removal; and, when the minor is removed from his own family, to secure for him custody, care and discipline as nearly as possible equivalent to that which should have been given by his parents. This chapter shall be liberally construed to carry out these purposes."

Section 726 states in part that ". . . no . . . dependent child shall be taken from the physical custody of a parent . . . unless upon the hearing the court finds one of the following facts: (a) That the parent or guardian is incapable of providing or has failed or neglected to provide proper maintenance, training, and education for the minor. . . . (c) That the welfare of the minor requires that his custody be taken from his parent or guardian."

In connection with families receiving assistance under the AFDC program, section 11205 provides that "It is the object and purpose of this chapter to . . . keep children in their own homes wherever possible, . . ."[5]

The courts are equally solicitous of family life. A recent statement on the subject is found in *Stanley* v. *Illinois* (1972) 405 U.S. 645, 651 [31 L.Ed.2d 551, 558, 92 S.Ct. 1208]: "It is plain that the interest of a parent in the companionship, care, custody, and management of his or her children 'come[s] to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements.' *Kovacs* v. *Cooper,* 336 U.S. 77, 95 (1949) (Frankfurter, J., concurring).

"The Court has frequently emphasized the importance of the family. The rights to conceive and to raise one's children have been deemed 'essential,' *Meyer* v. *Nebraska,* 262 U.S. 390, 399 (1923), 'basic civil rights of man,' *Skinner* v. *Oklahoma,* 316 U.S. 535, 541 (1942), and '[r]ights far more precious . . . than property rights,' *May* v. *Anderson,* 345 U.S. 528, 533 (1953). 'It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.' *Prince* v. *Massachusetts,* 321 U.S. 158, 166 (1944). The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, *Meyer* v. *Nebraska, supra,* at 399,

---

[5]Other statutory indications of the strong desirability of maintaining families as a unit and of removing children from the parental home only when absolutely necessary are found in sections 10000 and 10001, and in 42 United States Code Annotated, section 601.

the Equal Protection Clause of the Fourteenth Amendment, *Skinner* v. *Oklahoma, supra,* at 541, and the Ninth Amendment, *Griswold* v. *Connecticut,* 381 U.S. 479, 496 (1965) (Goldberg, J., concurring)."

In various contexts the California courts have recognized the importance of the family relationship. Speaking of the obligation of a parent to pay the cost of detaining a minor in a county facility the court said in *County of Alameda* v. *Espinoza,* 243 Cal.App.2d 534, 548 [52 Cal.Rptr. 480], that ". . . the basic philosophy of the juvenile court recognizes that the normal relationship of parent and child should not be disturbed except to insure protection of the public and the welfare of the child; that where interference with that relationship is necessary and warranted it should not extend beyond what is necessary to effect the necessary corrective measures; and that such measures as are taken should be directed to the restoration of a normal parent-child relationship . . . ." In connection with the sufficiency of the evidence to warrant removing a delinquent child from parental custody it was said in *In re Donna G.,* 6 Cal.App.3d 890, 894 [86 Cal.Rptr. 421] that ". . . removal of the minor from parental custody is a matter of last resort and . . . it should not be ordered unless other means have failed. . . ." (Cf. *In re Henry G.,* 28 Cal.App.3d 276, 284 [104 Cal.Rptr. 585] [importance of family relationship in connection with the sufficiency of the evidence to find a minor to be beyond the control of his parents under § 601].)

It is with this overriding societal interest in preserving the family in mind that we must examine the AFDC program in general, and the availability of child protective services in particular, to evaluate appellant's contention that such services must be afforded to her before the state may remove her children from her home.

### The Statutory Structure for Child Protective Services

█ The AFDC program is in part funded by the federal government (42 U.S.C.A. § 601 et seq.). Under that section the sums made available shall be used for making payments to states which have submitted and have had approved by the federal government, state plans for aid and services as may be necessary in the light of particular home conditions and other needs of the child, in order to maintain and strengthen family life and foster child development. Child welfare services are defined (42 U.S.C.A. § 625) as ". . . public social services which supplement, or substitute for, parental care and supervision for the purpose of (1) preventing or remedying, or assisting in the solution of problems which may result in, the neglect . . . of children . . . and (4) otherwise protecting

and promoting the welfare of children, including the strengthening of their own homes where possible . . . ." Pursuant to this federal mandate, California has provided that the state through its Department of Social Welfare and county departments shall establish a public system of state-wide child protective services. (§§ 16500-16511.) "Child protective services" are defined (§ 16502.5) in the same manner as "child-welfare services" are defined in 42 United States Codes Annotated, section 625.

"The United States Supreme Court has said: 'State participation in federal welfare programs is not required. States may choose not to apply for federal assistance or may join in some, but not all, of the various programs. . . . As long as a State is receiving federal funds, however, it is under a legal requirement to comply with the federal conditions placed on the receipt of those funds; . . .' (*Rosado* v. *Wyman* (1970) 397 U.S. 397, 427 [25 L.Ed.2d 442, 464, 90 S.Ct. 1207].) The California Supreme Court has recognized that when the state chooses to join a federal program the California plan must comply with the mandatory requirements established by the Social Security Act and the regulations promulgated thereunder. The Director 'must establish regulations not in conflict with federal law (Welf. & Inst. Code, § 10604), and must administer the state program "to secure full compliance with the applicable provisions of state and federal laws" (Welf. & Inst. Code, § 10600).' (*County of Alameda* v. *Carleson* (1971) 5 Cal.3d 730, 739 [97 Cal.Rptr. 385, 488 P.2d 953].)" (*Rogers* v. *Carleson,* 30 Cal.App.3d 54, 58 [106 Cal.Rptr. 140].)

### Appellant's Right to Child Protective Services

We recognize that it has been held in connection with AFDC and other federal programs, that under varying circumstances individual recipients of welfare or potential beneficiaries of other federal programs may make individual claims to enforce the provisions of those federal statutes.[6]

However, the extent to which child protective services will or will not benefit a given family must in our view be decided on a case by case basis. There are a number of reasons for this conclusion. First, the

[6]*Euresti* v. *Stenner* (10th Cir. 1972) 458 F.2d 1115 [standing to sue for reasonable amount of free or below cost hospital services under Hill-Burton Act, 42 U.S.C. § 291, et seq.]; *Gomez* v. *Florida State Employment Service* (5th Cir. 1969) 417 F.2d 569 [individual farm worker can assert private civil remedy to complain of substandard housing where federal grant-in-aid is given for farm worker recruitment pursuant to Wagner-Peyser Act of 1933]; *Cook* v. *Ochsner Foundation Hospital* (E.D.La. 1970) 319 F.Supp. 603 [11 A.L.R.3d 677] [individual action under Hill-Burton Act]. Contra: *Stanturf* v. *Sipes* (W.D.Mo. 1963) 224 F.Supp. 883, affirmed (8th Cir. 1964) 335 F.2d 224. See *Mooney* v. *Pickett,* 4 Cal.3d 669 [94 Cal.Rptr. 279, 483 P.2d 1231].

problems facing each family receiving AFDC benefits must necessarily differ. The need for protective services will vary according to the particular exigencies facing each family. Some problems will be easy and immediate of solution; others difficult and of long duration. Some will require emergency action, others will not. Each situation will have to be evaluated on its own merits. The facts of this case indicate that a blanket requirement for providing protective services might indeed be unwise and in fact contrary to the welfare of the minors involved and hence to the welfare of the family itself. The juvenile court petitions were filed here because at least some of the minors were the victims of severe malnutrition which had adversely affected them mentally, physically and socially; they were in the care of an unfortunate, albeit loving, mother who herself was receiving benefits' under the aid to the totally disabled program because of her mental retardation. These children might well have suffered further severe malnutrition if the social worker had been required to teach Mrs. Q. to cook before starting juvenile court proceedings. No one would argue that a suffocating child should be denied relief while the mother is being taught artificial respiration. We simply do not know what further harm might have occurred if the DPSS had first been required to offer protective services before taking steps to remove the children from her home.

Second, we are fortified in our conclusion that there can be no mandatory application of the program in each case by a consideration of the statute itself. Thus section 16505 provides that "The services offered to families under this program shall be voluntary." Mrs. Q. rejected assistance and advice in the form of counseling in nutrition and child care subsequent to the orders appealed from here.[7] Thus if her attitude remains the same protective services could not be offered to her. Also, section 16506 provides among other things "Further it is the purpose of this part to supplement and not supplant existing services for children by the addition of state protective services for children, and nothing herein shall be construed as changing in any way the responsibility of probation officers and departments for initiating juvenile court proceedings . . . ."

In sum we believe that when a social worker is confronted with a family situation in which child protective services, or indeed other family services which may be available, seem to be appropriate, serious and continuing evaluation must be made as to whether such services in fact

[7]At oral argument the parties stipulated that we might take judicial notice of the contents of the juvenile court file in this case. The statement set out earlier in this opinion that Mrs. Q. cannot read, write, or tell time appears in the original social worker's report in that file and hence, contrary to an argument made to us by peti-

may be offered without endangering the welfare of children in the home. If, within the sound discretion of the social worker it appears that such services can properly be utilized, they should be instituted. If the services are not found to be appropriate a continuing re-evaluation of the situation should be undertaken.[8]

This is, in effect, what the DPSS regulations require.[9] The administrative directive fortifies our conclusion that the situation in which services may be required are so varied that no blanket requirement could be contemplated by the statutes dealing with child protective services.

---

tion for rehearing, is properly a part of the record in this case. The statement in the text concerning rejection of assistance and advice is also in the file, being taken from the supplemental social worker's report at the time of the court's annual review of the status of the children in July of 1972. It therefore is likewise properly before us. The latter statement is mentioned, not to support the original orders under review here, but to illustrate the problems which would be inherent in a Procrustean requirement that protective services be tried in each case.

[8]The supplemental social worker's report in this case states that "[a]lthough aid has been offered to minor's mother in the form of counseling in nutrition and child care, and at one point, daily instruction from the minor's paternal grandmother, minor's mother has not been able to retain such information for the benefit of her children or has rejected assistance and advice outright."

[9]"HOMEMAKER SERVICE

"Homemaker Service is provided in the family home by trained homemakers who are supervised, directed, and assigned by professional homemaker staff. Homemaker Service is aimed at maintaining and safeguarding the home and family life for children by keeping families intact and preventing family breakdown during crisis situations. Homemaker Service is provided only as part of a casework plan. Its use is not permitted when responsible relatives or other family members are able to provide this service.

"Homemaker Service differs from Housekeeping Service in the nature and degree of responsibility assumed by the Homemaker for the care and supervision of the children, and of the home. In effect the homemaker replaces the mother in these functions whether or not the mother is in the home. Housekeepers on the other hand perform mainly household chores and supervise children under the direction of the mother. In essence, homemakers are differentiated from housekeepers in that the former are primarily responsible for caring for children and the latter are chiefly responsible for doing household chores. The two services are not interchangeable. A housekeeper may not be substituted for a homemaker if child care is the service being purchased.

"Examples of cases where service may be provided:

"1. Where the mother is prevented from caring for her children through illness, hospitalization, short term incarceration or other crisis.

"2. When the parent is in the home and there is a clear and present danger to the children because the parent is incapable of performing her duties due to physical, mental or social problems and placement of the children would otherwise be necessary.

"3. On aided Protective Service cases when a request for service has been made by a Protective Service or Court Worker during a diagnostic period, or while an optimum on-going plan is developed.

"4. For families who are providing for a handicapped or chronically ill child,

In addition to these factors, the juvenile court is of course circumscribed by statutory regulation of its actions. We have already adverted to the finding which must be made under section 726 before a minor may be removed from the custody of his parents. In addition, section 502, *supra,* (p. 295) places constraints on the decision of the juvenile court to remove a child from its parents' home. A decision taking a child away from the custody of its parents must obviously be made with great deliberation and only after full consideration of all possible alternatives which might make such a decision unnecessary. From the mere determination that a child is a dependent child of the court pursuant to section 600 it does not automatically follow that the child's welfare will require that his custody be taken from his parent or guardian. "The juvenile court is constantly faced with the necessity of choosing in behalf of a child, the best of several not entirely satisfactory alternatives. It is seldom possible to make such a choice on the mechanical basis that the proof of some particular fact 'ipso facto' calls for a predetermined response." (*In re A. J.,* 274 Cal.App.2d 199, 202 [78 Cal.Rptr. 880].) Thus, once the juvenile court itself has sustained a petition and found a minor to be within its jurisdiction it should, in reaching its decision or disposition, consider whether child protective services are a solution to the problems of the

---

who need help periodically, or, in short blocks of time, so that they may perform duties that take them away from home.

"5. To provide temporary relief for foster parents in emergency situations to avoid replacement of children.

"  .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"POLICIES OF HOMEMAKER SERVICE

"1. Referral for Homemaker Service must come from the Social Worker for the case in which eligibility has been established for public assistance. Relatives and neighbors sometimes perform the services without cost, and all such resources shall be explored before referral is made.

"2. It is the responsibility of the Social Worker to obtain the recipient's consent on all cases.

"3. Direct supervision of Homemakers is given by the Homemaker Supervisor. The Social Worker continues with her usual responsibilities while Homemaker Service is in effect.

"4. The Social Worker must obtain medical clearance that illness is not communicable or infectious when service is requested for a home in which this question arises.

"5. The Homemaker Supervisor has the responsibility to reject or terminate Homemaker Service when it is no longer appropriate.

"6. A Homemaker does not carry the duties of a practical nurse, visiting nurse, and attendant or maid.

"  .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"The primary objective of Homemaker Services is to prevent total disorganization of separation of parents and children. The use of Homemaker Service is based upon a social or medical diagnosis. When a request for placement is received, or a situation develops in an AFDC family which appears to call for the services of a Homemaker, the situation is evaluated in accordance with the Homemaker Service policies before the children are removed.

"  .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

case at hand. However, the same factors which preclude an arbitrary requirement that social workers may not institute juvenile proceedings without first providing child protective services, likewise preclude holding that the juvenile court must automatically order such services in each case before removing a child from the custody of its parents.

On the record of this case it is clear to us that the court had in its mind the possibility of furnishing services in the home, even prior to the time it determined that the children were dependent children of the court.[10] Thus in questioning a medical witness it indicated its awareness that the DPSS could provide close supervision in instructing on the subject of proper nutritional habits. The court further questioned the social worker as to her efforts in trying to solve the nutrition problems and asked Mrs. Q. whether anybody had ever talked to her about feeding, cleaning and caring for her children.

The question of providing home services was argued by counsel prior to the court's making its jurisdictional determination. At the disposition hearing the major subject of the testimony was whether Mrs. Q.'s sister could live in the home as a homemaker. Thus we cannot hold that the court failed to give consideration to the availability of child protective services.[11] The evidence adduced at the jurisdictional hearing clearly showed that two children were suffering from severe malnutrition and that their condition might be improved with "every bit of support that . . . our community could give them" although the doctor who examined them was unable to say that they would return to complete normalcy. The other children he thought "would be perfectly fine" if adequate nutrition was given to them. Clearly substantial evidence supports the order of the trial court.

---

"The Homemaker Supervisor receives and evaluates all referrals for Homemaker Service that come to her unit. The Homemaker Supervisor and her staff operate and implement services on the basis that the prime purpose and objectives of the Department's Homemaker Service program is the prevention of placement of children.

". . . . . . . . . . .

"The Homemaker Supervisor gives priority to the families with the largest number of children and to those in which, because of special factors, emergency placement would be particularly traumatic to the children involved. . . ."

[10]While the court did not expressly make the statutory finding under section 726, subdivision (a) that Mrs. Q. was incapable of providing or had failed or neglected to provide proper maintenance or training for the minors, it did sustain paragraph I of each petition. As we set forth above, those paragraphs expressly related to the lack of proper and effective parental care and control.

[11]The record indicates that these services were the subject of a report to the court in the first annual review of the disposition order held pursuant to section 729. In conformity with the availability of such services and with Mrs. Q.'s willingness (§ 16505) and ability to benefit from them, the court would clearly inquire in each

### It is not Unconstitutional to Remove Dependent Children
### from the Custody of Their Parents

■ Mrs. Q. argues that "While a State may retain the *parens patriae* right to remove children from their home where there is intentional or incurable neglect, it cannot exercise that prerogative where the neglect is unintentional and the State makes no effort to eradicate it or prove that it is incurable." She argues that since she has done the best she could constitutional grounds prevent the state from removing her children from her home. While United States Supreme Court decisions have recognized that constitutional guarantees apply to the protection of family life (see *Stanley* v. *Illinois, supra,* 405 U.S. 645), the decisions have not prevented the state from stepping into the home to protect children who are deemed to be endangered. Thus *Stanley* merely held that due process and equal protection considerations prevented Illinois from taking children from their natural father simply because he had not been married to the mother of the children. *Meyer* v. *Nebraska* (1923) *supra,* 262 U.S. 390, 399 [67 L.Ed. 1042, 1045, 43 S.Ct. 625] involved only a criminal prosecution for the "offense" of teaching a child the subject of reading in the German language in violation of a Nebraska statute. *Skinner* v. *Oklahoma* (1942) *supra,* 316 U.S. 535, 541 [86 L.Ed. 1655, 1660, 62 S.Ct. 488] involved a criminal sterilization statute and *Griswold* v. *Connecticut* (1965) *supra,* 381 U.S. 479, 496 [14 L.Ed.2d 510, 522, 85 S.Ct. 1678] involved the right of the state to regulate the availability of contraceptives to married couples.

Indeed a case principally relied upon by appellant, *Prince* v. *Massachusetts* (1944) *supra,* 321 U.S. 158, 166 [88 L.Ed. 645, 652, 64 S.Ct. 438] illustrates that where harm of a much less dramatic kind than that involved here comes to a minor, the state may regulate the conduct in question even though the regulation conflicts with the parents' concept of how to raise their children. In *Prince* the conviction of a guardian for violating a statute which made it unlawful for a child to sell material on the streets and for any person to furnish material for such sale was upheld. Referring to the guardian's claim that this was an improper interference with the right of parents to raise their children, the court stated that "the family itself is not beyond regulation in the public interest . . . ." (321 U.S. at p. 166.) The evidence in this case established that the children were seriously endangered by malnutrition. If the relatively minimal, and

---

subsequent annual hearing as to the possibility of using such services. Further, the mother need not await the annual review. If she can make a factual showing of changed circumstances she can herself bring the matter on for hearing at an earlier date. (§ 778.)

clearly nonphysical "harm" involved in *Prince* was sufficient to allow the state to act, clearly the very serious and real physical and mental harm involved here, no matter how innocently caused, is a proper subject of state regulation.

### There Was No Error as to the Siblings' Petition

■ Mrs. Q. points out that only Jeannie and Larry were found to be suffering from malnutrition and that there was no evidence that the three siblings were anything but healthy. Her claim is that the alleged practice of DPSS to file petitions alleging facts which they cannot prove (presumably that Roy and Carlos were the victims of malnutrition) should be discouraged. She states that there was no showing that she was not capable of exercising proper parental care and control as to the three youngest children. We believe the argument is misplaced. We agree with appellant that on this record the adjudication must stand or fall on the evidence of malnutrition. It is true that Dr. Osgood testified that Roy and Carlos were normal children and that no contention to the contrary was ever made as to the baby Michelle. But the undernourishment—the actual nutritional deprivation—suffered by Jeannie and Larry is mute testimony that the same fate could befall the three youngest siblings, if the situation was allowed to continue. The court could well infer that, through Mrs. Q.'s well-intentioned but totally inept efforts to care for them the presently healthy children would inevitably suffer the same debilities as their older siblings. This inference furnishes adequate support for the court's determination that the three youngest children had no parent capable of exercising proper parental control. (Cf. *In re Biggs,* 17 Cal.App.3d 337, 342 [94 Cal.Rptr. 519].)

### Evidentiary Contentions

■ The testimony concerning the malnutrition of the children came almost entirely from Dr. Osgood. Appellant objected at the juvenile court hearing to the admissibility of this testimony on the ground that the physician-patient privilege (Evid. Code, § 992) precluded it. Her argument is that as the natural parent of the children she is the holder of the privilege and is the one entitled to waive it. The argument is in error. Evidence Code section 1004 provides that "There is no privilege . . . in a proceeding to commit the patient or otherwise place him or his property, or both, under the control of another because of his alleged mental or physical condition." We hold that this section is applicable in a proceeding under section 600 to have a minor declared to be a dependent child of the court when the child's physical or mental condition is in issue. The

mother urges that Evidence Code section 1004 should not apply to such a proceeding because "the adjudication is directed towards the ability of the parent to provide a proper home for the child—not towards the mental or physical condition of the child." The argument misses the point. An adjudication that a minor is a ward or a dependent child of the court may limit a parent's control over a child or take the child from the physical custody of the parent (§ 726). Such an adjudication may, as it did here, directly involve the physical and mental condition of the child. Evidence Code section 1004 is squarely applicable.

██ Appellant next argues that Dr. Osgood's testimony and that of the social worker was privileged under section 10850. That section provides that all records kept by any public officer or agency in connection with the administration of any provision of the code relating to any form of public social services for which federal grants-in-aid are received shall be confidential and "not open to examination for any purpose not directly connected with the administration of such public social service . . ." However the information may be made available to the district attorney and to other public agencies for purposes directly connected with the administration of public social services. The argument as to the doctor is that he was an agent of the DPSS because he provided the social worker with information for the administration of her job, she having arranged for the medical examination. Since he testified in part from his records, appellant says they are confidential. We categorically reject this argument and the additional argument that any of the social worker's testimony was privileged. The Q. family was itself under the AFDC program. The physical welfare of the children is of prime interest to the state and to the DPSS in its administration of the program. That program requires that the social worker responsible for a family see that the minors are in good physical and mental condition. Insofar as this case is concerned, no privilege existed under section 10850. *In re Cager,* 251 Md. 473 [248 A.2d 384] cited by appellant is not in point.

The final argument raised by the mother is that section 701 is unconstitutional insofar as it permits the admission of incompetent evidence in dependency proceedings. The section provides, in applicable part, that for the purpose of determining the question whether a minor is a person described by section 600 "any matter or information relevant and material to the circumstances or acts which are alleged to bring him within the jurisdiction of the juvenile court is admissible and may be received in evidence; . . ." Appellant makes a lengthy argument that this provision deprived her of due process and confrontation rights and precluded her from cross-examining witnesses. We do not consider the argument any

further because we are given no indication of any such deprivation having occurred in the hearings in this matter. Indeed, the argument seems to be made in a vacuum, so far as this case is concerned. If it is intended to relate to the testimony of the doctor and the social worker, our holding that that testimony is not privileged eliminates the basis for any complaint as to section 701.

The judgments (orders) appealed from are affirmed.

Stephens, Acting P. J., and Ashby, J., concurred.

A petition for a rehearing was denied May 10, 1973, and appellant's petition for a hearing by the Supreme Court was denied June 28, 1973.