57 Cal.App.3d 406 (1976)
129 Cal. Rptr. 338
In re ROSE G. et al., Minors.
LOS ANGELES COUNTY DEPARTMENT OF ADOPTIONS, Petitioner and Respondent,
v.
MIRIAM C. et al., Objectors and Appellants.
Docket No. 46445.
Court of Appeals of California, Second District, Division Four.
April 19, 1976.
*411 COUNSEL
Ron Bain, under appointment by the Court of Appeal, Daniel M. Luevano, Rosalyn M. Chapman, Philip L. Goar, W. Kenneth Rice and Dorothy T. Lang for Objectors and Appellants.
John H. Larson, County Counsel, and Paul T. Hanson, Deputy County Counsel, for Petitioner and Respondent.
OPINION
JEFFERSON (Bernard), J.
Petitioner, County of Los Angeles Department of Adoptions, brought this action pursuant to Civil Code section 232.9, seeking to have minors Angelica G. and Rose G. *412 declared free from parental custody and control.[1] The petition, filed October 6, 1972, specifically relied upon subdivisions (a) and (b) of Civil Code section 232,[2] and was opposed by the natural parents of the minors, Rafael G. and Miriam C.[3] After a series of hearings, ending in May 1973, the trial court granted the petition on August 1, 1973, on the basis of Civil Code section 232, subdivision (a), only. The natural parents then requested findings of fact and conclusions of law. This request was denied September 6, 1973. Judgment was entered October 30, 1973, and the natural parents have appealed. A post-trial motion was made below on the parents' behalf seeking to stay execution of the judgment until the appeal had been concluded; to reinstate parental visiting rights with the minors, pending appeal; and to obtain without cost to the parents, as indigents, a clerk's transcript and a reporter's transcript on appeal. The trial court denied visiting rights, but ordered that no adoption of the minors could take place until the appeal was concluded; it also denied the parents the right to free transcripts. Thereafter the parents obtained a writ of mandate from this court compelling that they be provided with the transcripts without costs to them. (Crespo v. Superior Court (1974) 41 Cal. App.3d 115 [115 Cal. Rptr. 681].)
Angelica G. was born February 1, 1969, to Miriam C. and Rafael G. The parents' life together constituted a stormy relationship punctuated with outbursts of physical violence. Angelica C. had two older brothers, Rafael, Jr., and Raymond. Miriam C. was receiving financial assistance from the Department of Social Services of Los Angeles County (hereinafter, DPSS) for the three children, but she had demonstrated an inability properly to manage the funds so given to such an extent that she had been placed on "mismanagement" status, which allowed the *413 department to make direct payment to certain vendors (such as landlords) in an effort to ensure an adequate environment for the children. Despite this effort, social work visits to the home of Miriam C. revealed that the children were unclothed (during the winter), poorly fed and cared for, and left unsupervised on occasion. In February 1970, when Angelica G. was about a year old, she and her brothers were removed from Miriam C.'s custody due to lack of parental supervision and to parental neglect, were declared dependent children of the juvenile court pursuant to Welfare and Institutions Code section 600, and were ordered suitably placed in foster care.
While these children were so placed, Miriam C., again pregnant by Rafael G., gave birth to another daughter, Rose G. on September 5, 1970. Miriam continued to receive financial assistance from the DPSS. In November 1970, DPSS worker Arlene Shayer became aware that Miriam C. and Rafael G., with their daughter, Rose G., were living temporarily in an automobile parked near one of the DPSS offices. The police were called, and removed Rose G. from the custody of her parents; she, too, was declared a dependent child of the juvenile court, and ordered suitably placed when she was approximately two months old. At the time of hearing in this matter, all of the children remained in foster care, and had had their dependency status renewed on an annual basis.
Prior to the placement of Rose G., social worker Shayer and Miriam C. were on amicable terms, but their relationship deteriorated thereafter. Miriam C. demanded the return of her children; Shayer responded that Miriam C. must make an effort to organize her own life better, so that the children could be returned. Miriam C. no longer received financial assistance as a mother with dependent children, but did receive approximately $115 per month in the form of general relief. The monthly grant included a very small sum for transportation. The older children, the boys, had been placed in San Gabriel; Angelica was placed in Norwalk, and Rose G. in Carson. Miriam C. lived in downtown Los Angeles; she did not drive. Her only dependable source of transportation to the various homes in which her children were placed was by bus. She did request, and receive, at least once, special funds for transportation. But in 1971, no more funds were available to the DPSS for this purpose. It was testified to at the hearing that the children were not placed nearer to the downtown area because foster homes in the area were few in number.
*414 Miriam C. was referred to the Department of Human Resources, the state employment agency, but did not attempt to find work through this source. She explained to social worker Shayer that she was too lazy to ride a bus to work. Employment had apparently been suggested, at least in part, as a means for obtaining additional funds for Miriam C.'s transportation needs.
During the early part of Angelica's placement, Miriam C. called Angelica's foster mother on one occasion to find out how Angelica was. Other than that, Miriam C. never, prior to the filing of the petition, visited Angelica, nor did she telephone again, write, or send gifts. Miriam C. did visit Rose once in the summer of 1971, shortly before the child was a year old, but was upset because Rose did not recognize her. Social worker Shayer discussed this development with Miriam C., pointing out that the only solution was regular visits with Rose. Miriam C. did not visit Rose again, prior to the filing of the petition.
During the period between 1970 and 1972, while the children were in placement, Miriam C. moved frequently, staying in the downtown area. One effort was made by her to find housing suitable for her and the children, an effort assisted by a community worker under DPSS supervision. Often Miriam C.'s monthly general relief checks were held at her DPSS area office, because her whereabouts were unknown. For a time she used an alias because she was trying to avoid contact with Rafael G. No home visits were made by DPSS workers Shayer and Dinnerstein, who were responsible for her case.
Miriam C. would, however, visit the area office, and it was stipulated at trial that she demanded the return of her children once every six months. She also demanded that they be placed together and that they be placed closer to the downtown area. Many of her demands concerning the children were made while she was so emotional, and were framed in such abusive terms, that her DPSS workers, particularly Shayer, found it impossible to have a meaningful discussion of the issues. The DPSS knew that Miriam C. had a history of mental difficulty, having been institutionalized for that reason in New York when she was 13 years of age. While the testimony is not completely clear on this point, it was apparently made known to Miriam C. that counseling services were available through DPSS, but no specific referral for such services was ever made.
*415 During the period from 1970 to 1972, Rafael G. spent most of his time in the county jail on various charges. He would obtain his freedom only to be incarcerated again. At one point, a condition of his probation was that he not associate with Miriam C.; Miriam C. did avoid Rafael G. At no time did the citee-father attempt to visit the children. At the time of the hearings in this matter, Rafael G. was again in custody, and brought to the hearings from jail.
The section 232 petition was filed with respect to the two younger children only. Miriam C. reestablished contact with her sons, who were moved from San Gabriel to Highland Park. She was able to maintain a working relationship with the boys' foster mother, Lupe Handy, and was seeing the boys regularly at the time of these hearings.
As of the time of this appeal, Angelica G. and Rose G., now respectively seven and five years of age, are living together in a prospective adoptive home in Long Beach. They have had no meaningful contact during their childhood to date with their natural parents, although sustained and capable legal efforts to secure their return to their natural parents have been made since October 1972.
The natural parents first contend on this appeal that reversal of the trial court's judgment is required because the trial court refused, as requested by the parents, to make findings of fact and conclusions of law.
Code of Civil Procedure section 632 requires the making of findings of fact and conclusions of law after "the trial of a question of fact" if so requested by any party. The traditional view has been that section 632 is inapplicable to so-called "special proceedings" (Code Civ. Proc., § 23) such as the one that concerns us herein. The trial court, relying on Adoption of Thevenin (1961) 189 Cal. App.2d 245, 251 [11 Cal. Rptr. 219]; In re Helen J. (1973) 31 Cal. App.3d 238, 244 [107 Cal. Rptr. 106]; and 4 Witkin, California Procedure (2d ed. 1971) Trial, pages 3114-3115, adopted this view and refused to make the requested findings. At the time this ruling was made, it was certainly declarative of the existing law. The only determination required of the court was that the judgment made be in the best "interests and welfare" of the child, and that expression is contained in the judgment before us. (Civ. Code, § 232.5; see In re Neal (1968) 265 Cal. App.2d 482 [71 Cal. Rptr. 300] for discussion of this determination, although the case does not squarely hold that a written finding must be made.)
*416 The parents argue that they are constitutionally entitled to written findings because the rights of parents to the parent-child relationship are civil rights requiring substantial constitutional recognition and protection (see Stanley v. Illinois (1972) 405 U.S. 645 [31 L.Ed.2d 551, 92 S.Ct. 1208]) and, consequently, proceedings seeking termination of the parent-child relationship for all time, as section 232 proceedings do, must be conducted with scrupulous concern for parental rights, including the making of express findings of fact and conclusions of law in support of the judgment. The parents also argue that to distinguish these proceedings from other ordinary civil proceedings in the application of Code of Civil Procedure section 632 results in unequal protection of the law for the litigants in section 232 proceedings.
(1) We agree that findings of fact and conclusions of law are required in proceedings such as this if findings are requested by a party to the proceedings. We reach our conclusion not only on due process constitutional grounds, but on the basis of recent decisional law of the California Supreme Court, which has emphasized that basic fairness, as well as adequate appellate review, requires findings at the trial (or administrative) level. (See, e.g., Topanga Assn. for a Scenic Community v. County of Los Angeles (1974) 11 Cal.3d 506 [113 Cal. Rptr. 836, 522 P.2d 12] (zoning); In re Sturm (1974) 11 Cal.3d 258 [113 Cal. Rptr. 361, 521 P.2d 97] (denial of parole must be supported by a written definitive statement of reasons).) Recent decisions of the Courts of Appeal have also reflected recognition of the necessity of findings in cases involving the custody of children (In re J.T. (1974) 40 Cal. App.3d 633 [115 Cal. Rptr. 553]; In re Susan Lynn M. (1975) 53 Cal. App.3d 300 [125 Cal. Rptr. 707]), although nowhere have we found an express holding requiring general findings of fact and conclusions of law in Civil Code section 232 proceedings.
In such proceedings, it does not seem unreasonable to require that findings of fact and conclusions of law be prepared showing that the elements are present to bring the minors within the ambit of Civil Code section 232. In addition, there must be a finding that the best interests and welfare of the minor(s) would be served by the judgment. This latter requirement we consider as constituting a part of Civil Code section 232, subdivisions (a) and (b), by virtue of the provisions of section 232.5 (added to the Civil Code in 1965): "The provisions of this chapter shall be liberally construed to serve and protect the interests and welfare of the child." (See In re Neal, supra.)
*417 (2) In the event the judgment rendered is that of a termination of the parent-child relationship, there must be the additional finding that the minors' return to their parents would be detrimental to such minors.
(3) In the present case, one crucial factual finding would have been a determination of the presence  or absence  of the intent, on the part of the natural parents, to abandon the minors. The implied finding supporting the judgment of termination is that they did intend to abandon the minors when they failed to communicate with them for more than six months.
We deem it insufficient that the finding of intent to abandon may be implied from the judgment (cf. Guardianship of Marino (1973) 30 Cal. App.3d 952 [106 Cal. Rptr. 655]) or that we may exercise the power held by appellate courts to supply a missing finding if it is supported by evidence in the trial record. (Code Civ. Proc., § 909; cf. Chaffin v. Frye (1975) 45 Cal. App.3d 39, 45, fn. 1 [119 Cal. Rptr. 22].) We hold that such a finding must be an express finding in a Civil Code section 232 proceeding, especially since a parent is being deprived of custody of a child, unless findings are waived. In view of our holding, we do not reach the issue the natural parents raise with respect to equal protection of the law.
We note that the trial court did not make what has come to be known as a "B.G." or "4600" finding, required in all custodial proceedings since 1974, after this judgment was entered, as set forth in In re B.G. (1974) 11 Cal.3d 679 [114 Cal. Rptr. 444, 523 P.2d 244]. In that case a custodial decision of the juvenile court adverse to the mother of the minors was reversed because of the failure of the juvenile court expressly to find that an award of custody to her would, in the language of Civil Code section 4600, "be detrimental" to the children. The California Supreme Court imposed this express "detriment" finding uniformly in all types of custody proceedings, pointing out that "California has at least eight separate proceedings in which custody questions can be litigated." (In re B.G., supra, 11 Cal.3d 679, at p. 696.)
In In re T.M.R. (1974) 41 Cal. App.3d 694 [116 Cal. Rptr. 292], the Court of Appeal applied the detriment-finding requirement prospectively when it reversed, for other reasons, a section 232 termination judgment entered prior to In re B.G. (Cf. In re Susan Lynn M., supra, which may be distinguishable on the ground that there were other matters requiring reversal.)
*418 (4) In light of the views expressed in In re B.G., In re J.T., In re T.M.R. and In re Susan Lynn M., the traditional distinction between "special proceedings" and "general proceedings" insofar as the applicability of Code of Civil Procedure section 632 is concerned in requiring or not requiring findings of fact and conclusions of law, must give way to a criterion of the importance of the issues of fact to be determined. In custody-of-minors proceedings, the issues at stake are of such tremendous consequences that findings of fact and conclusions of law as required by section 632 of the Code of Civil Procedure must be considered applicable even though the proceeding is denominated a "special proceeding."
However, we do not reverse the judgment below for lack of findings of fact and conclusions of law since the trend in the law we have discussed developed after this judgment was entered. Nothing in In re B.G., or in other decisional law decided since, suggests that that case must be applied retroactively, and no court, as far as we know, has expressly ruled that general findings are constitutionally mandated in custody proceedings. When this judgment was entered, the law, which the trial court judge reviewed before his decision (and was briefed by the parties to this appeal) was to the contrary; it had been declared anew in a recent appellate court opinion written in 1973, In re Helen J., supra, and it governed the outcome of this proceeding in the trial court. Our holding that findings of fact and conclusions of law are required in Civil Code section 232 proceedings in accordance with the provisions of sections 632 and 634 of the Code of Civil Procedure is to be applied prospectively.
The natural parents next attack the presumption contained in Civil Code section 232, subdivision (a), concerning intent to abandon based upon failure to communicate for six months as an improper one. They assert that the application of this presumption results in a denial of due process. Subdivision (a) of section 232 provides, inter alia, that "such failure to communicate for the period of six months, shall be presumptive evidence of the intent to abandon." The parents argue, first of all, that this presumption allows the trial judge too much discretion in determining whether communications with the minors are merely "token" in nature. They claim also that the presumption is an "irrebuttable" presumption. They further contend that the six-month limitation is a creature of convenience for the state, and has no realistic relation to parental intent; and that since the drastic consequence of an adverse intent ruling to the parents is based upon this unrealistic time limitation of six months, the result is a denial of due process.
*419 Petitioner counters with the argument that the statute makes more sense if read without reference to any presumption, but concedes that the party seeking to terminate the parent-child relationship, i.e., the petitioner, always has had the burden of proof in regard to establishing intent to abandon, and that petitioner sustained the burden herein.
(5) We have not been directed to, nor have we found, any definitive expression of the legislative intent involved in the 1965 amendment to section 232 which changed the time limitation of subdivision (a) from one year to six months. We conclude, however, that when the Legislature employs the term "presumptive evidence" it means that there is a rebuttable presumption involved, one created by statute. We find support for this interpretation in In re Neal (1968) 265 Cal. App.2d 482, 488 [71 Cal. Rptr. 300], where the court stated: "Absent communication or support for the period of six months, within the meaning of section 232, the presumption arises that Ronald intended to abandon his son. This presumption may be overcome by opposing evidence...." (Italics added.)
(6) Neal does not tell us whether the presumption created by Civil Code section 232, subdivision (a), is to be classified as a presumption that affects the burden of proof (Evid. Code, § 606) or a presumption that affects the burden of producing evidence (Evid. Code, § 604). The determinative factor in classifying the Civil Code section 232 presumption as one or the other is that of the public policy served by the presumption. (See Jefferson, Cal. Evidence Benchbook (1972) § 46.2, p. 797.) If the only public policy supporting the creation of the presumption is that of facilitating the determination of the particular action in which the presumption is to be applied, the presumption is one that affects the burden of producing evidence. (Evid. Code, § 603.) On the other hand, if a presumption is established to effectuate some public policy other than, or in addition to, the policy to facilitate the determination of the particular action in which the presumption is to be applied, the presumption is to be considered as one that affects the burden of proof. (Evid. Code, § 605.)
We find no legislative intent specifically expressed in shortening the abandonment time from one year to six months. However, we consider that the presumptive fact of an "intent to abandon" constitutes a logical inference to be drawn from the basic facts of the presumption  a six-month period without provision for support by, or without communication from, such parent. A logical-inference presumption tends to *420 indicate a policy of furtherance of the trial of the action and that such a presumption should be classified as a presumption that affects the burden of producing evidence. We find no other public policy that supports the section 232 presumption.
(7) Considering the importance of the opposing interests in such hearings, that of the government (as parens patriae) or other interested person on the one hand, and the natural parents on the other, it would appear appropriate for the burden of proof to remain with the petitioner in section 232 proceedings, i.e., with the party seeking to terminate the parent-child relationship. This burden of proof is that of proof by a preponderance of the evidence. (Evid. Code, § 115.) In amending Civil Code section 232, subdivision (a), the Legislature provided for a beyond-a-reasonable-doubt standard in subdivision (a)(7), but set forth no such burden-of-proof standard in subdivision (a)(1), which is the successor to subdivision (a) of section 232 involved in the case at bench. We see no reason, therefore, for a judicial imposition of a burden-of-proof standard higher than that of a preponderance of the evidence.
(8) We find no due process problem implicit in the operation of the section 232 presumption. The parents' argument assumes that the purpose of the six-month limitation is to punish parents. The Legislature, however, tells us that the purpose of the entire abandonment procedure is to benefit children, and that it is to be liberally construed to that end. (Civ. Code, § 232.5.) The due process contention also assumes a hostile environment and a hostile government, overwhelming parents with the various elements of time, distance and harassment by welfare officials, rendering the six-month period constitutionally defective. However, the reality is that parents sincerely interested in maintaining contact, whether by telephone, card or personal visit, with their children, or with the persons responsible for their care, will do so under ordinary circumstances in any six-month period.
Even if we assume that the interests of parents are substantially similar in importance to the rights of a criminal defendant, we still reach the result that the section 232 presumption is immune from attack on due process grounds. A statute that creates a presumption that affects the burden of proof may be invoked against a defendant in a criminal case if there is a rational connection between the basic facts of the presumption and the presumed fact. (Leary v. United States (1969) 395 U.S. 6 [23 L.Ed.2d 57, 89 S.Ct. 1532]; People v. Lachman (1972) 23 Cal. App.3d 1094 *421 [100 Cal. Rptr. 710].) In the instant case, we deal with a presumption that does not affect the burden of proof and, in addition, has the logical connection between the basic facts and the presumed fact.
(9) The natural parents next argue that before initiating proceedings to declare a minor free from the custody of its parents, a county welfare department such as DPSS, must first make available to the parents federally mandated case work services[4] designed to reunite the family unit at the earliest possible time. The parents assert that if such services have not been made available, a judicial termination of the parent-child relationship constitutes a violation of the due process clause of the United States Constitution. The same argument has been made in two other recent cases, In re Jeannie Q. (1973) 32 Cal. App.3d 288 [107 Cal. Rptr. 646], and In re Susan Lynn M. (1975) 53 Cal. App.3d 300 [125 Cal. Rptr. 707].
Relying on two recent United States Supreme Court cases, Weinberger v. Wiesenfeld (1975) 420 U.S. 636 [43 L.Ed.2d 514, 95 S.Ct. 1225], and Stanley v. Illinois, supra, the Susan Lynn M. court observed that "[a] judgment freeing a child from the custody and control of its parents results in the total severance of the natural ties between the parents and the child and amounts to the taking of `a liberty' under the due process clause of the United States Constitution. [Citations.]" (Susan Lynn M., supra, 53 Cal. App.3d 300, at p. 310.) We agree that procedural due process must be satisfied to sustain a judgment freeing a minor from parental custody and control under section 232 of the Civil Code.
We are fully cognizant of the fact that prevailing governmental policy, as reflected in legislation and in administrative regulations at all levels of government  state, federal and county  is to employ supportive, rehabilitative procedures to reunite and strengthen families whenever and wherever possible. As was stated in In re Susan Lynn M., "the possibility *422 of offering these services to the parents in a `last ditch' effort to save the family should be weighed carefully by social welfare departments before such departments embark on a course [termination of the parent-child relationship] which at best offers a drastic and irrevocable solution." (Susan Lynn M., supra, 53 Cal. App.3d 300, at p. 311, fn. omitted.) Thus, the Susan Lynn M. court returned the case to the trial court to hear additional evidence (evidence it had earlier rejected) as to whether the natural mother had in fact been offered a rehabilitation program, a determination it felt should be made before a termination judgment could be upheld.
In re Jeannie Q. discusses the impact of rehabilitative efforts at length, the court concluding, however, that it was not mandatory to offer such services in all cases prior to removal of children from the custody of their parents. The court stated that "the extent to which child protective services will or will not benefit a given family must in our view be decided on a case by case basis." (In re Jeannie Q., supra, 32 Cal. App.3d 288, at p. 298.) The court was reviewing a situation where young children had been found to be suffering from extreme malnutrition, and commented that "[t]hese children might well have suffered further severe malnutrition if the social worker had been required to teach Mrs. Q. to cook before starting juvenile court proceedings." (Id., at p. 299.) The requirement, according to the Jeannie Q. court, was for "serious and continuing evaluation" of whether a given family's circumstances require such services, although the court also points out that "section 16505 [Welf. & Inst. Code] provides that `The services offered to families under this program shall be voluntary.'" (Id., at p. 299.) (Italics added.) It is true that Jeannie Q. concerned only placement by the juvenile court, and was not dealing with as drastic a situation as the one we consider here, but the Jeannie Q. court rejected the concept that constitutional due process requires that child protective services must be given in every case before the family unit may be dispersed to a protective placement situation.
In the case at bench, we likewise reject the contention that protective services are mandated in every case by constitutional due process requirements.
The natural parents herein argue that the record supports the conclusion that the DPSS failed totally to follow the general policy favoring rehabilitative efforts as set forth in its own directive. Evidence was introduced with respect to the kinds of supportive services available *423 in Los Angeles County that included special transportation allowances for parental visits to foster homes, homemaker services and counseling services.
Petitioner-respondent contends that the record is supportive of a conclusion that the DPSS did the very best it could with a difficult, hostile mother, and met the "good social work" standard. Here, it appears that some effort was made to provide services to Miriam C., although nothing approaching what might be termed "intensive" effort was undertaken. This situation arose, at least in part, because of Miriam C.'s combative stance with DPSS worker Shayer after Rose was removed in 1970. This hostility prevented any meaningful discussion of available alternatives, and made resolution of the problems necessitating the original placement of the children impossible.
(10) We consider that evidence as to the availability of supportive services to the parents, the extent, if any, the DPSS employed the available rehabilitative services, and the reasons for lack of any services being offered, or the lack of more intensive efforts, is relevant evidence in a section 232 proceeding on the issues involved: of the existence or nonexistence of parental intent to abandon a subject minor child, whether the best interests and welfare of such minor child will be served by taking custody from the parents, and whether return of a child to the parents would be detrimental to such child. Such evidence must be weighed by the trial judge, along with all other evidence, in making a determination of these issues and whether petitioner has sustained the requisite burden of proof as to these issues.
The parents next attack the sufficiency of the evidence to support the trial court's judgment, asserting especially that intent on the part of the parents to abandon the minor girls was not established. We disagree. We set forth our disagreement in light of the presumption that is created by Civil Code section 232, subdivision (a).
(11) The evidence is undisputed that, at the time this petition was filed, neither of the natural parents had communicated, even on a "token" basis, with the two minors for more than six months. The basic facts of the presumption having been established, the presumed fact of an intent by the parents to abandon their two minor daughters was compelled in the absence of evidence, introduced by such parents as the opponents of the presumption, sufficient to sustain a finding of the *424 nonexistence of the presumed fact of their intent to abandon their two minor daughters.
(12) The parents point out on this appeal that the evidence is without contradiction that Miriam C. often demanded the return of the children; it is argued that because Miriam C. never, in her mind, reconciled herself to the loss of her daughters, she never had the requisite statutory intent to abandon them. This evidence as to the nonexistence of the presumed fact of an intent to abandon we deem sufficient to support a finding of the nonexistence of the presumed fact. Hence, the presumption disappeared with the introduction of such evidence, and the trial court was required to determine the existence or nonexistence of the presumed fact (1) without regard to the presumption; (2) with no change in the allocation of the burden of proof with respect to the presumed fact; and (3) by weighing the evidence as to the existence of the basic facts of the presumption and any appropriate inferences arising from these facts against the evidence as to the nonexistence of the presumed fact, and resolve the conflict. (Evid. Code, § 604; see Jefferson, Cal. Evidence Benchbook (1972) § 46.3, pp. 801-809.)
We consider that, in light of the principles set forth above, the evidence was ample to sustain the trial court's judgment. The evidence establishes that from 1970 to 1972, at the time these proceedings commenced, Miriam C. and Rafael G. were so involved with personal problems of their own (not the least of which was the dynamics of their interrelationship) that they had nothing left to give to their children, who were passing through crucial, formative years; it was left to other more responsible persons to provide these children with all the things that children need, including good physical and emotional care. Intent to abandon, as in other areas, may be found on the basis of an objective measurement of conduct, as opposed to stated desire. Demanding the return of children was not a substitute for displaying the kind of emotional control and capabilities to care for the children that might have resulted in their return. The fact is that Miriam C. failed to communicate with her daughters in any meaningful way for a period far longer than six months, at an important time in their lives, regardless of her private concern. It was what was communicated to the children that matters. The father of the children has been even less responsible than the mother with respect to meaningful contact; being incarcerated does not, in and of itself, provide a legal defense to abandonment of children. It was possible to ascertain the children's whereabouts and at least show *425 concern about their welfare; there is nothing in this record which suggests concern on the part of the citee-father.
Also, an important element that a trial court must consider, when making a decision about children, is the impact of the passage of time. Childhood is short; many basic attitudes and capacities are developed in the very early years. Ties are formed to the adults present in the child's life, and can only be broken by inviting emotional disaster. As was stated in In re Sherman M. (1974) 39 Cal. App.3d 40, 44-45 [113 Cal. Rptr. 847], "the issue is best presented not by the question `Who has the right to custody of the child?' but by the question `What will promote and protect the best interests of the child?'" Implicit in answering such question is an assessment of the child's situation as of the time of trial. In the instant case, the trial court had to choose between competing basic interests, that of the parents and of the children; the interests may or may not coincide. Here the determination was made to free the children for adoption, and that determination is supported by implied findings that there existed an intent by the parents to abandon their minor daughters, that it was in the best interests and welfare of such minors that their custody be taken from the parents, and that it would be detrimental to such minors if they were returned to the parents. The judgment is supported by substantial evidence.
(13) The natural parents also make an attack upon an evidentiary ruling of the trial court. They contend that the trial court erred in admitting in evidence a "make-sheet," which was attached to the probation officer's report and which showed various arrests of Miriam C. The trial court properly ruled that the probation report was admissible as an exception to the hearsay rule[5] and also admitted the attachment. The trial judge remarked that he would disregard evidence concerning arrests, but allowed petitioner to elicit from Miriam C. that she had sustained a conviction of burglary. The natural parents contend that the "make-sheet" should have been excluded as prejudicial and inflammatory to the mother's case.
*426 A probation report is itself hearsay evidence as it constitutes the hearsay statements of the probation officer. To the extent that it relates statements made by others to the probation officer, it constitutes double and sometimes multiple hearsay. Civil Code section 233 makes a probation report admissible in proceedings related to the welfare of children because of the necessity of providing the court with a coherent picture of the child's situation. Since the probation report itself might have included an account of Miriam C.'s arrests, and the dispositions made of the arrests, we fail to see how a "make-sheet" attached to the report is distinguishable in effect. There is nothing in the statute which indicates a limitation on admissibility of a probation report to statements of the probation officer relating facts within his own personal knowledge.
Evidence of a parent's conviction of a crime would appear to have some relevancy in determining the best interests of children of such parent, while evidence of arrests would appear, at best, to have little or no relevancy. Of course, when a party (even in a civil case) testifies, evidence of a felony conviction may be used to impeach that testimony. (Evid. Code, § 788.) We conclude that the "make-sheet," though multiple hearsay, was properly admitted as part of the probation report in light of the trial judge's statement that he would not consider the arrests, as distinct from convictions, as of any evidentiary value. We conclude that the "make-sheet," as limited by the trial judge, was properly admitted as part of the probation report. We do not find that the probative value of the "make-sheet," as so limited, was outweighed by any danger of undue prejudice to the parents so as to require its exclusion under Evidence Code section 352.
The judgment appealed from is affirmed.
Kingsley, Acting P.J., and Dunn, J., concurred.
Appellants' petitions for a hearing by the Supreme Court were denied July 1, 1976.
NOTES
[1] Civil Code section 232.9 authorizes a county adoption department, among other agencies, to initiate an action under Civil Code section 232.
[2] These sections have now been renumbered (a) (1) and (2). Before such renumbering, Civil Code section 232 provided, in pertinent part: "An action may be brought for the purpose of having any person under the age of 21 years declared free from the custody and control of either or both of his parents when such person comes within any of the following descriptions: [¶] (a) Who has been left ... by both of his parents or his sole parent ... without communication from such parent or parents, for the period of six months with the intent on the part of such parent or parents to abandon such person.... [¶] (b) Who has been cruelly treated or neglected by either or both of his parents, if such person has been a dependent child of the juvenile court, and such parent or parents deprived of his custody for the period of one year prior to the filing of a petition...."
[3] The citee-mother was represented at trial, and is represented on this appeal, by attorneys of the Center of Parental and Juvenile Justice and the Western Center on Law and Poverty. The citee-father was represented at trial, and on this appeal, by court-appointed private counsel.
[4] The services are described in the Federal Aid to Families With Dependent Children program (42 U.S.C.A. §§ 601-610) and in the Federal Child Welfare Services program (42 U.S.C.A. §§ 620-626). They are implemented in California by sections 16500-16511 of the Welfare and Institutions Code. Since California chooses to receive federal funds to support these programs, the state has the obligation of establishing appropriate regulations concerning services to carry out the federal policy of strengthening family units. (See Welf. & Inst. Code § 10600: County of Alameda v. Carleson (1971) 5 Cal.3d 730, 739 [97 Cal. Rptr. 385, 488 P.2d 953].) Included in such services are a wide range of casework alternatives such as counseling and the encouragement of the preservation of family ties as dictated by the circumstances involved in the individual family situation.
[5] Civil Code section 233 provides, in pertinent part, that in section 232 proceedings "[t]he court shall receive such report in evidence and shall read and consider the contents thereof in rendering its judgment." Evidence Code section 1200 provides for admissibility of hearsay evidence meeting the conditions of an exception to the hearsay rule created by statute or decisional law. Exceptions to the hearsay rule may thus be found in other codes as well as in the Evidence Code. (See the Senate Committee on Judiciary's comment to Evid. Code, § 1200.)