Filed 12/4/14  In re J.G. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re J.G., a Minor. | |
| | D065561 |
| M.M., | |
| Plaintiff and Respondent, | (Super. Ct. No. A59059) |
| v. | |
| J.G., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Kimberlee Lagotta, Judge.  Affirmed.


Kathleen Murphy Mallinger, under appointment by the Court of Appeal, for Defendant and Appellant.

Amy Zimmer Tobin, under appointment by the Court of Appeal, for Plaintiff and Respondent.

Nine-year-old J.G. (JG) appeals the denial of his father's and stepmother's petition to declare him free from the custody and control of his biological mother, M.M. (Mother). (Fam. Code, § 7822, subd. (a)(3).)[1] JG contends substantial evidence did not support the court's findings. We reject JG's contentions and affirm.

FACTS AND PROCEDURE

*Factual Background*[2]

JG was born in January 2005. His parents, Father and Mother, met and began dating in 2001 or 2002 and moved to Arizona at the end of 2004. In November 2004, while pregnant with JG, Mother was pursued in a police chase; she fled to Mexico and remained there for one month. Mother returned to Arizona and gave birth to JG.

About one year later, Mother was arrested for bringing drugs into the United States across the Mexican border, and received a four-year sentence in Arizona. Father and JG then moved to San Diego to live with Father's parents. During the next four years, Mother maintained contact with JG through letters, cards, phone calls, and occasional visits.

While Mother was incarcerated in Arizona, Father began his relationship with his current wife, Nicole. Father, JG, and Nicole moved in together in October 2007. In May 2008, Father filed for and was awarded legal and physical custody of JG, with Mother's approval. Nine months later, in February 2009, Father and Nicole married.

---

[1]    All further unspecified statutory references are to the Family Code.

[2]    We summarize the relevant facts in the light most favorable to the court's order, drawing all reasonable inferences in support of the court's findings.

2

At about this same time, Mother was released from prison and moved back to San Diego. She immediately filed a motion in family court to obtain visitation with, and/or joint custody of, JG. In about April 2009, the family court granted her weekly supervised visits with JG. During the next two to three months Mother visited with JG on a weekly basis, and would additionally speak with him on the telephone when he was visiting the paternal grandparents.

However, in July 2009, Mother was arrested and was placed in custody for about two months. During this time, Mother sent letters to Father apologizing for her criminal behavior and also complaining that he was not "sharing" JG with her.

After her release in August 2009, Mother asked the paternal grandparents to supervise her visits with JG. Although they were willing to do so, Father refused to allow them to assist Mother. However, the paternal grandparents helped Mother pay for weekly supervised visits during the next two months. Mother then continued to have weekly visits with JG.

In October 2009, Mother relapsed and was arrested for a theft offense. She was incarcerated from December 2009 to August 2010. While in custody, Mother maintained contact with JG through phone calls and letters.

In August 2010, Mother moved to a rehabilitation facility and, in November 2010, was permitted weekly supervised visits with JG. During this time, Mother and JG developed a close, positive relationship. The trained supervisor found Mother was "very motivated" to strengthen her relationship with JG. In March 2011, the family court

granted Mother unsupervised visits with JG, and in June 2011, Mother and JG began overnight visits while she was living in a halfway house.

However, three months later, in about September 2012, Mother was arrested for a methamphetamine-related offense. She received a six-year sentence and was incarcerated in March 2013 at Las Colinas Detention Center. Mother has since sent JG numerous cards and letters, many with elaborate drawings and graphics. Las Colinas allows visitors, but Father refused Mother's request that he bring JG for visits. Father also initially did not permit any phone contact between JG and Mother, but Mother successfully petitioned the family court to require weekly communications. In about June 2013, the family court affirmed Father's sole legal and physical custody of JG, and granted Mother weekly phone calls with JG, to be followed by a step-up visitation plan upon her release.

*Section 7822 Petition*

One month after the family court ordered Father to allow the weekly phone calls, Father and Nicole petitioned the family court for JG's freedom from Mother's custody and control under section 7822, subdivision (a)(3). They filed the petition as a companion motion to Nicole's stepparent-adoption petition. They alleged Mother left JG "in the care and custody of the other parent for a period of one year without any provision for the child's support, or without communication from the parent with the intent on the part of the parent to abandon the child." (See § 7822, subd. (a)(3).) As later clarified, they claimed Mother had no contact with JG from July 2009 to September 2010, and that she had failed to provide financial support for JG except for a brief period in 2011 and 2012.

4

Five months later, San Diego County Health and Human Services Agency (Agency) adoptions social worker Tina Jako prepared a statutorily-required report after interviewing all participants (Father, Nicole, Mother, and JG). In the report, Jako recommended that the court deny the section 7822 petition. Jako stated she found Mother's claims credible that she "has always attempted to have contact with her son," and did not believe Father's and Nicole's assertions that there was no contact between Mother and JG from July 2009 through September 2010. Jako also opined that adoption was not in JG's best interests because he had not been provided with full information regarding Mother's status and whereabouts, and he "needs to be in therapy to assist with his understanding of the truth and reality."

In the report, Jako said that she twice spoke with 8-year-old JG (who has been diagnosed with ADHD), and that JG said he *wanted* to be adopted by Nicole, calls Nicole "mom," and did not "like" contacts or visits with Mother. However, Jako also said that JG expressed conflicting feelings about Mother, saying at one point that he liked Mother's letters and visits. Based on her training and experience, Jako believed that JG's statements about Mother were rehearsed and confused, and that the validity of his opinions were suspect because he had not been given accurate, age-appropriate information regarding his birth mother.

*Section 7822 Court Hearing*

At the hearing, Father and Nicole both testified in support of their section 7822 petition. Father said that JG and Nicole have a very close relationship, and adoption would provide JG with a "stable environment." Father maintained that Mother does not

have "anything positive to offer" JG, and that Mother has "been in and out . . . of jail for the last 20 years. . . . Once she starts getting back into his life, it's hard seeing him after she has to leave again for a couple of years, and then I don't think that's good for him."

Nicole testified that she was concerned for JG's safety when he was with Mother because of her drug addiction and criminal history, and she discussed her difficult interactions with Mother. Nicole said that she considers JG to be her son and she "love[s] him to death." She said she goes to all of his parent-teacher conferences, is in e-mail contact with JG's teachers, and is "constantly involved with everything for him." She said she believes adoption would be in JG's best interests because "he needs a stable environment with somebody who wants to be there, who proves that they want to be there and is there physically, emotionally, . . . and actually knows him."

Although both Father and Nicole denied (or did not remember) that Mother had contact with JG between July 2009 and August 2010, Mother presented evidence (including her own testimony and the testimony of the paternal grandparents) that there were contacts during this time. Although somewhat reluctant witnesses, the grandparents' testimony reflected that Mother had made efforts throughout the years to maintain a relationship with JG, including during the July 2009 through August 2010 time period. Mother also presented independent witnesses who testified about the positive nature of JG's supervised visits before and after Mother's 2009-2010 incarceration, and that Father and Nicole sometimes made it difficult for Mother to have the visits.

6

In her testimony, 45-year-old Mother acknowledged she is a methamphetamine addict, but said she never intended to abandon JG and discussed her strong love for JG and her numerous contacts with JG (as summarized above). She said she has made one or two video recordings for JG and submitted a computer record of numerous cards/graphics she sent JG while at Las Colinas. She said that she is actively working on her addiction recovery while in prison. She said that although she is able to have visitors, Father has refused to bring JG for visits. Father also refused to take her phone calls until the family court ordered that Mother be permitted to speak with JG at least once a week.

Social worker Jako also testified at the hearing. Jako has a master's degree in social work, has been an Agency social worker (mostly in the adoptions section) for about 27 years, and has worked in the "freedom from custody and control" section for the past 12 years. Jako said that Nicole is a very "organized person" who is "responsible" and "on top of [things]." But Jako reaffirmed her recommendation that the court deny the section 7822 petition. Based on her professional experience and her review of all available information, Jako found that Mother did not intend to abandon JG. Jako said the quality of Mother's contacts was unusual for this type of case. She found Mother's cards and letters to JG "to be quite extensive," and consistent with the information Mother provided about the nature and amount of contact she had over the years. Jako also indicated that although she did not need to reach the issue, she did not believe a termination of parental rights was in JG's best interests because JG did not have an appropriate understanding of the relevant issues or events regarding his biological mother.

7

*Counsel's Arguments*

During closing arguments, counsel for Father and Nicole emphasized the evidence showing Mother failed to pay support for JG and the absence of any contact between Mother and JG from July 2009 through August 2010. Counsel acknowledged that Mother "clearly showed that she wanted to have contact with her son," but argued that Mother manifested an intent to abandon JG by repeatedly engaging in criminal conduct leading to lengthy incarcerations. Counsel also emphasized Nicole's strong attachment to JG and that JG has substantially benefited from his relationship with his stepmother.

JG's counsel urged the court to grant the petition. Counsel stated that she interviewed JG "within the past week and a half and he has grown up a lot since the first time I interviewed him . . . in July of 2013. . . . And [in the latest interview] he was very, very clear in his direction to me as my client. He wishes to be adopted by his stepmother." JG's counsel argued that despite the many "letters, cards, and supervised visits, and family court hearings," Mother abandoned JG because she has repeatedly chosen to engage in criminal behavior and therefore voluntarily become unavailable to parent her son. She argued that JG needs stability, and has never viewed Mother as a "parental figure."

Mother's counsel argued the evidence showed Mother is committed to her son and has maintained contact with JG at all times. Counsel noted that Mother had made numerous attempts to resolve her addiction problem, and continues to engage in recovery efforts while in prison. Regarding Mother's financial support obligations, counsel stated that "I don't think Mother has ever tried to avoid her financial obligation. I think that

8

there were periods of time when she was incarcerated she did not have the financial ability to pay. But when she was out of custody, was working, it appears that the DA child support effectuated a garnishment, so there were always monies that she, ultimately, was providing through that garnishment to provide for and help with the support of her son." (Italics added.)

*Court's Findings*

After considering the evidence and argument, the court denied the petition. The court stated that it "weigh[ed] and [took] into account the expertise of Ms. Jako, who has been a social worker since 1991," and found the paternal grandparents' testimony was "very persuasive" regarding Mother's consistent communications and contacts with JG and her commitment to maintaining a relationship with JG. The court discussed Mother's conduct both when she was in custody and when she was released from custody. The court said that when she was out of custody, Mother "made every effort through the family court to obtain the ability to have supervised visits. And she did, in fact, follow through with the visits." The court found that "[w]hile in custody [Mother] did everything she could within the rules of the facilities . . . to either communicate with her son by telephone or by letter or by visits when individuals would bring her son to the facility."

The court also found that it was in JG's best interests to continue his relationship with his biological mother, noting Jako's testimony that it was unclear whether JG's opinions were based on an appropriate understanding of the relevant circumstances. The court concluded that "although I understand and appreciate . . . the fact that [Nicole] has

9

taken on the role in this matter as mother to [JG], there is insufficient evidence to support by clear and convincing evidence that [Mother] has abandoned her child *with the intent to abandon*, pursuant to . . . section 7822, nor is it in the best interest of the child that the mother's rights be terminated." (Italics added.)

## DISCUSSION

### I. *Applicable Legal Principles*

If a parent has left her child "in the care and custody of the other parent for a period of one year without any provision for the child's support, or without communication from the parent, with the intent on the part of the parent to abandon the child," a court may declare the child free from the parent's custody and control and terminate the parent's rights. (§§ 7822, subd.(a)(3), 7803; see *In re E.M.* (2014) 228 Cal.App.4th 828, 838 (*E.M.*).) The failure to provide support *or* the failure to communicate during the statutory period "is presumptive evidence of the intent to abandon." (§ 7822 subd. (b).) This presumption may be overcome by evidence showing the parent had no intent to abandon. " ' " '[T]o constitute abandonment there must be *an actual desertion*, accompanied with an intention to entirely sever, so far as it is possible to do so, the parental relation and throw off all obligations growing out of the [relationship].' " ' " (*E.M.*, at p. 839; *In re Daniel M*. (1993) 16 Cal.App.4th 878, 886 (*Daniel M.*).) To negate abandonment, a parent must engage in more than "token efforts to support or communicate with the child." (§ 7822, subd. (b); *E.M.*, at p. 838.)

The party seeking to sever the parent-child relationship must prove abandonment and the intent to abandon by clear and convincing evidence. (§ 7821; see *In re Amy A.*

10

(2005) 132 Cal.App.4th 63, 67-68.) In determining intent, relevant factors include the quantity and quality of the parent/child communications and the genuineness of the parent's efforts to maintain the relationship. (See *In re B.J.B.* (1986) 185 Cal.App.3d 1201, 1212.) Although an intent to abandon involves a subjective inquiry, the intent finding may be based on "an objective measurement of conduct." (*People v. Ryan* (1999) 76 Cal.App.4th 1304, 1316; see *In re Rose G.* (1976) 57 Cal.App.3d 406, 424 (*Rose G.*).) A parent who honestly desires to maintain a relationship, but who does nothing to implement this desire, can be found to have the intent to abandon the child. (See *In re B.J.B., supra*, 185 Cal.App.3d at p. 1212.)

" ' "[The] question whether [an] intent to abandon exists and whether it has existed for the statutory period is a question of fact for the trial court, to be determined upon all the facts and circumstances of the case." ' " (*E.M., supra*, 228 Cal.App.4th at p. 839.) "The reviewing court examines the record [for] substantial evidence to support the trial court's conclusions. [Citation.] The reviewing court has no power to pass on the credibility of witnesses, resolve conflicts in the evidence or determine the weight of the evidence. [Citation.] It is the appellant's burden on review to show that the evidence is insufficient to support the trial court's findings." (*Ibid*.)

## II. *Analysis*

### A. *Presumption of Abandonment*

The court did not make an express finding whether the evidence was sufficient to trigger a presumption of abandonment under the statute. (§ 7822, subd. (b).) However, it appears the court did not apply the presumption. The court rejected Father's and Nicole's

11

argument that Mother had no contact with JG for the one year period July 2009 through August 2010. The evidence supported this finding. There was evidence showing that Mother sent cards and letters and had occasional phone calls with JG during this period, and that these contacts reflected Mother's meaningful efforts to maintain her relationship with her child. The court found the grandparents' testimony to be particularly credible on these issues.

With respect to the child support issue, the evidence showed that at various times Mother did pay child support (through voluntary payments and/or wage garnishments), but at other times, Mother did not meet her support obligations primarily because of her claimed inability to pay. Generally, nonsupport by a parent who does not have the ability to pay cannot, standing alone, prove intent to abandon or trigger the presumption of intent to abandon. (See *Allison C., supra*, 164 Cal.App.4th at p. 1013; *Baby Boy M.* (1990) 221 Cal.App.3d 475, 482; *Guardianship of Pankey* (1974) 38 Cal.App.3d 919, 932; *Adoption of Oukes* (1971) 14 Cal.App.3d 459, 467.) We presume the court understood and properly applied this rule. (Evid. Code, § 664.)

In any event, as explained below, even if the court found (or should have found) that Father and Nicole met their burden to trigger the statutory abandonment presumption, substantial evidence supported that Mother rebutted the presumption.

B. *Substantial Evidence Supports Court's Finding of No Intent To Abandon*

At the section 7822 hearing, Mother presented evidence showing she consistently maintained communication and contacts with JG, including when she was incarcerated. As found by the trial court, this evidence supported that these interactions were not

"token" communications and instead the communications reflected meaningful efforts to create and maintain a relationship to the best of her ability.

At the hearing, counsel for Father and Nicole acknowledged there were two very different versions of the facts presented at trial: (1) their testimony showing minimal and perfunctory contact from Mother, and (2) Mother's testimony showing a constant stream of letters, notes, telephone calls, family court petitions, and (sometimes) personal visits. Counsel for Father and Nicole urged the court to accept their testimony, and to reject Mother's testimony, particularly because she was a drug addict and had a lengthy criminal history. Although the trial court could have done so, it was not required to disbelieve Mother, particularly because her version of the events was corroborated by other witnesses and documentary evidence. After considering all the evidence and observing the demeanor of the parties and witnesses, the court was in the best position to ascertain the truth regarding the parties' differing versions of the facts. The court acted within its authority to find Mother's version credible.

JG contends that Mother abandoned him because she voluntarily put herself in a position "not to parent." He notes that Mother has spent about two-thirds of his life in custody, and she remains incarcerated today.

Although this argument has considerable intuitive appeal, it is not a sufficient basis for a termination of parental rights under California law. California courts have long recognized that a noncustodial parent's incarceration is insufficient to show abandonment under section 7822, subdivision (a)(3). (See *In re T.M.R.* (1974) 41 Cal.App.3d 694, 699-700; see also *In re Brittany S.* (1993) 17 Cal.App.4th 1399, 1402;

13

*Mark N. v. Superior Court* (1998) 60 Cal.App.4th 996, 1011-1012.) An incarcerated parent who makes meaningful efforts to maintain a relationship with the child and takes advantage of all opportunities to do so, does not necessarily forfeit his or her parental rights. "[T]he involuntary termination of parental rights [is] a 'drastic remedy which should be resorted to only in extreme cases of neglect or abandonment.' " (*Neumann v. Melgar* (2004) 121 Cal.App.4th 152, 163 (*Neumann*); see *Hoversten v. Superior Court* (1999) 74 Cal.App.4th 636, 641.)

JG contends that Mother could not negate abandonment "simply by intending to become a parent sometime in the future." We agree. However, there was evidence presented from which the trial court could find that Mother did not merely sit back and wait until she was out of prison to maintain the relationship. There was evidence showing she took affirmative steps—including sending elaborate cards and letters, telephoning, filing petitions in family court to obtain visitation orders, and visiting when she was able—to continue her relationship with her son. The fact that she had never assumed a day-to-day parental role does not show the court erred in concluding that there was no intent to abandon her child under section 7822, subdivision (a)(3). Although the parental-type bond is a requirement in other statutory contexts (see Welf. & Ins. Code, § 366.26), it is not the dispositive issue in a parental-abandonment case where there is one fit parent.

In this respect, this case is distinguishable from *Adoption of O.M.* (2008) 169 Cal.App.4th 672, upon which JG relies. In *O.M.*, the issue was whether the relationship

between a biological father and his infant child qualified for constitutional protection under *Kelsey S*. and thus permitted him to block a third-party adoption. (*O.M.,* at pp. 678-682; *Adoption of Kelsey S*. (1992) 1 Cal.4th 816.) To qualify, the biological father was required to " 'demonstrate "a willingness *himself* to assume *full* custody of the child—not merely to block adoption by others." ' " (*O.M.,* at p. 681; *Kelsey S.*, at p. 849.) The father acknowledged he did not meet the *Kelsey S.* criteria, but argued the mother prevented him from doing so. (*O.M.*, at p. 680.) The court rejected the argument in part because it was the father's criminal actions (and subsequent 12-year prison sentence) that led to his inability to fulfill his parental responsibilities. (*Ibid.*)

This case is distinguishable because it arises under section 7822, subdivision (a)(3) which assumes one fit parent and focuses on the noncustodial parent's intent to abandon the child. The issue in *O.M.* involved third-party adoption and concerned whether the father's affirmative *action* upon the child's birth allowed him to step up to a presumed father status. (*O.M., supra*, 169 Cal.App.4th at pp. 674-675.)

JG's reliance on *Rose G., supra*, 57 Cal.App.3d 406 is also misplaced. In *Rose G.*, it was "undisputed" that neither of the parents "had communicated, even on a 'token' basis, with the two minors" for the statutory period. (*Id.* at p. 423.) The facts showed that the mother (who was not incarcerated) had the full opportunity to visit with her daughters, but she took no steps to do so. (*Id.* at pp. 412-414, 424.) With respect to the father (who was incarcerated for a portion of the statutory time), the court stated that "being incarcerated does not, in and of itself, provide a legal defense to abandonment of children," noting that "it was possible [for the father] to ascertain the children's

15

whereabouts and at least show concern about their welfare . . . ."  (*Id.* at pp. 424-425.)

Unlike the parents in *Rose G.*, there were facts supporting that Mother showed substantial

concern with JG's welfare and made efforts to play a role in his life despite her

incarceration.

Finally, JG's focus on a best interests analysis does not advance his position.

Although always a relevant consideration in juvenile proceedings, the child's best

interests is not a factor in the court's *initial* determination whether a parent abandoned his

or her child under section 7822, subdivision (a)(3).  (*In re Baby Boy S.* (1987) 194

Cal.App.3d 925, 933 ["Absent intent on the part of the parents to abandon the child . . .

the best interests and welfare criteria are simply not applicable"]; see *In re Daniel M.,*

*supra*, 16 Cal.App.4th at p. 886; see also *Kelsey S., supra*, 1 Cal.4th at p. 849; *In re*

*Cheryl E.* (1984) 161 Cal.3d 587, 606.)  Without a showing of unfitness, "[w]e . . . do not

in our society take children away from their mothers—married or otherwise—because

[there is] a 'better' adoptive parent . . . ."  (*Kelsey S.,* at p. 846.)  It is only *after* the court

finds parental abandonment, that the issue of the child's best interests comes into play.  If

the court finds abandonment, the court must then consider the child's best interests in the

determination whether to terminate parental rights.  (See *Neumann, supra*, 121

Cal.App.4th at p. 156; *In re Marcel N.* (1991) 235 Cal.App.3d 1007, 1014-1015.)

Further, there was substantial evidence to support the court's observation that

termination of parental rights was not in JG's best interests.  Based on the experienced

social worker's opinion that JG had not been provided full (age-appropriate) information

regarding his mother's situation and the ramifications of a stepparent adoption, and that

16

JG could benefit from therapy to understand these issues, the court had a reasonable basis to conclude that his best interests would not be served by a parental termination at this time. The statute requires a court to "consider the wishes of the child, bearing in mind the age of the child," when evaluating the child's best interests. (§ 7890.) Contrary to JG's assertions, the record does not support that the court "completely disregarded" his counsel's statement regarding his wishes. The record shows the court considered the statement, but found the experienced social worker's assessment was better reasoned and more credible.

We reach a similar conclusion regarding JG's argument the court erred because Nicole—and not Mother—had provided the day-to-day care for JG during most of his life and had a mother-son relationship with him. JG argues that the relevant issue for the trial court's consideration was "whether his relationship with [Mother], as compared to his relationship with Nicole, gives him the stability and security intended by the Legislature." We disagree. The predicate issue for the court's determination under section 7822, subdivision (a)(3) is whether the noncustodial parent abandoned the child and intended to abandon the child. If there was no abandonment, the court must deny the petition to terminate parental rights, regardless who is the "better" parent, the biological mother or the stepmother. (See *In re Bisenius* (1959) 173 Cal.App.2d 518, 522.)

Finally, we note that the purpose of the section 7822 statutory scheme is to provide children with stability and safety when those conditions "are otherwise missing from the child's life." (§ 7800.) The evidence showed that JG is in a safe, stable, secure environment, and will remain there. Father maintains sole legal and physical custody of

17

JG, and undoubtedly, JG will continue to have the benefit of his stepmother's loving and highly-capable care. To the extent Father and Nicole believe that JG's continued communications with Mother is not in his best interests, they may raise those issues in family court custody proceedings.

## DISPOSITION

Judgment affirmed.

HALLER, Acting P. J.

WE CONCUR:

McDONALD, J.

AARON, J.

18